13-107-cv
*Central Rabbinical Congress v. New York City Department of Health & Mental Hygiene*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2013

Argued: December 3, 2013
Decided: August 15, 2014

No. 13-107-cv

————————————————————

CENTRAL RABBINICAL CONGRESS OF THE UNITED STATES & CANADA; AGUDATH
ISRAEL OF AMERICA; INTERNATIONAL BRIS ASSOCIATION; RABBI SAMUEL BLUM;
RABBI AHARON LEIMAN; and RABBI SHLOIME EICHENSTEIN,
*Plaintiffs-Appellants*,

- v. -

NEW YORK CITY DEPARTMENT OF HEALTH & MENTAL HYGIENE; NEW YORK CITY
BOARD OF HEALTH; and DR. THOMAS FARLEY, in his official capacity as
Commissioner of the New York City Department of Health & Mental Hygiene,
*Defendants-Appellees*.

————————————————————

Before:     LIVINGSTON, LOHIER, and CARNEY, *Circuit Judges*.

Appeal from a January 10, 2013, order of the United States District Court for the Southern District of New York (Buchwald, *J.*), denying the plaintiffs' motion for a preliminary injunction. Plaintiffs brought suit challenging section 181.21 of the New York City Health Code on the grounds that it compels speech in violation of the First Amendment and that it violates the right to free exercise of religion under

1

the First Amendment and the New York State Constitution.  The district court held that the ordinance does not compel speech and is subject to rational basis review under the Free Exercise Clause, and proceeded to deny a preliminary injunction. We hold that the challenged ordinance is neither neutral nor generally applicable and thus is subject to strict scrutiny under the Free Exercise Clause.  We vacate the order denying the preliminary injunction and remand for the district court to apply strict scrutiny to the ordinance.

VACATED and REMANDED.

SHAY DVORETZKY (Yaakov Roth, Todd R. Geremia, *on the brief*), Jones Day, Washington, DC, *for Plaintiffs-Appellants*.

MORDECAI NEWMAN (Larry Sonnenshein, Michelle Goldberg-Cahn, *on the brief*), New York City Law Department, New York, NY, *for Defendants-Appellees*.

Eric C. Rassbach, Daniel H. Blomberg, The Becket Fund for Religious Liberty, Washington, DC; Michael W. McConnell, Stanford, CA, *for Amicus Curiae The Becket Fund for Religious Liberty*.

Rory T. Gray, Alliance Defending Freedom, Lawrenceville, GA; Joseph P. Infranco, Alliance Defending Freedom, Scottsdale, AZ; M. Todd Parker, Moskowitz & Book, LLP, New York, NY, *for Amicus Curiae Alliance Defending Freedom*.

Akiva Shapiro, Gibson, Dunn & Crutcher LLP, New York, NY, *for Amici Curiae The American Academy of Pediatrics, Infectious Diseases Society of America, Pediatric Infectious Diseases Society, and American Sexually Transmitted Diseases Association*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

In Judaism, the "bris milah," or ritual circumcision of infants, which has been practiced for millennia, celebrates a covenant with God and "derives explicitly from a commandment . . . in the Hebrew Bible." 11 Encyclopedia of Religion, "Rites of Passage: Jewish Rites," at 7818 (2d ed. 2005). As part of this ritual circumcision, some Orthodox Jews, particularly Satmar, Bobov, Lubavitch, and other Hasidic groups, perform direct oral suction of the circumcision wound in a ritual act known as metzitzah b'peh ("metzitzah b'peh" or "MBP").

Over the last decade, the New York City Department of Health and Mental Hygiene (the "Department") has determined that metzitzah b'peh poses a health risk – the spread of herpes simplex virus ("HSV") – to male infants. Beginning around 2005, the Department embarked on a campaign to educate the Orthodox Jewish community about the risk. Concluding that this campaign was only a qualified success, the New York City Board of Health, which oversees the Department, promulgated section 181.21 ("§ 181.21" or the "Regulation") in 2012, adding this provision to the New York City Health Code directly to regulate metzitzah b'peh. The Regulation prohibits any person from performing direct oral suction as part of a circumcision without first obtaining signed written consent from

3

one of the child's parents.  The consent form must contain the warning that "the New York City Department of Health and Mental Hygiene advises parents that direct oral suction should not be performed." § 181.21.

Three organizations supporting the practice of MBP as part of bris milah and three mohelim who perform MBP (collectively, "plaintiffs") filed suit, challenging the Regulation as compelling speech in violation of the First Amendment and as burdening their free exercise of religion in violation of the same.  The district court denied the plaintiffs' motion for a preliminary injunction, holding, first, that the Regulation does not compel speech and, second, that it is a neutral and generally applicable law pursuant to *Employment Division v. Smith*, 494 U.S. 872 (1990), and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), so is subject only to rational basis review.

As to the second holding, we disagree.[1]  The Regulation is neither neutral nor,

---

[1] Because we determine that the Regulation must satisfy strict scrutiny under the Free Exercise Clause and that vacatur, accordingly, is required, we need not and do not address plaintiffs' alternative free speech argument.  Nor do we address plaintiffs' argument that the district court erred in its application of the more permissive balancing test applicable under the New York State Constitution's Free Exercise Clause. *See Catholic Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510, 525 (2006).

4

on this record, generally applicable and therefore must satisfy strict scrutiny.[2] The Regulation is not neutral because it purposefully and exclusively targets a religious practice for special burdens. And at least at this preliminary stage, the Regulation is not generally applicable either, because it is underinclusive in relation to its asserted secular goals: the Regulation pertains to religious conduct associated with a small percentage of HSV infection cases among infants, while leaving secular conduct associated with a larger percentage of such infection unaddressed.

We vacate the district court's order denying plaintiffs' motion for a preliminary injunction and remand for the district court to consider whether plaintiffs have shown a likelihood of success on the merits applying strict scrutiny. Acknowledging the weighty interests at stake in this litigation (the plaintiffs' in the free exercise of their faith and the Department's in the health of newborns and in informed parental consent concerning risks these newborns face), we express no

---

[2] There are two possible levels of scrutiny that may apply in assessing the constitutionality of a law challenged on free exercise grounds. Strict scrutiny, the more robust standard, requires that a law "be justified by a compelling governmental interest and . . . be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531. Alternatively, under rational basis review, "legislation is presumed to be valid and will be sustained if the [burden imposed] by the statute is rationally related to a legitimate state interest." *Town of E. Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (internal quotation marks omitted).

5

view as to whether plaintiffs have satisfied this standard, believing that careful adjudication will benefit in the first instance from the district court's comprehensive analysis.

## BACKGROUND

### A. Metzitzah b'peh

Jewish law requires that male children be circumcised on the eighth day after their birth, although circumcision may be postponed in some circumstances. According to the plaintiffs, this ritual circumcision, known as bris milah, is among the most important requirements of Jewish law and is derived from a covenant between God and Abraham. For thousands of years, Jews around the world have faithfully adhered to it.

One of the essential steps of bris milah, according to the plaintiffs, is metzitzah, during which suction is used to draw blood from the area of the circumcision wound. Traditional metzitzah, as practiced primarily among certain Hasidic groups, is performed by direct oral suction on the circumcision wound, or metzitzah b'peh. The plaintiffs assert that some Jewish religious authorities maintain that MBP is the proper means, and some deem it the only acceptable means, under Jewish law, to perform metzitzah.

6

Bris milah is performed by a mohel, typically a rabbi with specialized training. Mohelim are trained to take safety precautions when performing MBP. Among other precautions, mohelim do not perform circumcisions if they are exhibiting any symptoms of HSV infection; they minimize the duration of oral contact with the wound; and they rinse their mouths with an antiseptic before performing the ritual. Mohelim have performed metzitzah b'peh as part of bris milah around the world for millennia. Plaintiffs, while conceding that the Department "may use its own property, money, and agents to express its own views," believe it would be sinful for them, as mohelim, "to discourage parents from performing the bris milah ritual in what they regard as the religiously correct manner."

## B. HSV Transmission

The herpes simplex virus, or HSV, is present in some form in most American adults.[3] HSV infection may periodically cause "clusters of small, painful blisters [to] appear on the skin at the point where [the] virus was originally introduced," but such infection "does not usually cause symptoms" in adults. J.A. 366-67. By contrast, HSV in newborn infants "can be serious and life-threatening because

---

[3] There are two forms of herpes, HSV-1 and HSV-2. The type at issue here, HSV-1, is present in 60% of American adults and 73% of adults in New York City.

7

newborn infants do not have fully developed immune systems." J.A. 369. Approximately one-fifth of newborn infants infected with the herpes simplex virus die from the infection, and those surviving often suffer brain damage. The incidence of neonatal herpes infection (thankfully) is small: there are only about 15 cases each year in New York City, among approximately 125,000 live births.

Among newborn infants who do become infected, approximately 85% acquire the virus from their mothers during birth as they come in contact with virus present in the birth canal. Another five percent acquire the virus while in the mother's uterus. In only the remaining 10% of neonatal HSV infection cases do infants contract the infection *after* birth.

Most newborn infants are protected against HSV infection – accounting for the small number of cases – because infected mothers (and most mothers are infected) typically transfer antibodies against HSV to their babies through the placenta. These maternal antibodies protect the newborn against infection for several months after birth. If a mother does not become infected with the virus until the late stages of pregnancy, however, her body may not produce antibodies in time for them to be transferred to the baby, who is thus at greater risk of infection from the mother during birth (as well as from other sources in the months thereafter). According to

one of the City's experts, "[i]ntrapartum transmission from mother-to-infant during delivery [which accounts for 85% of neonatal HSV infection] is most likely to occur when the maternal infection is acquired during the last trimester of pregnancy." J.A. 315-16.

The practice of MBP potentially contributes to the 10% of HSV infections among infants that occur after birth. As to these cases, while the parties dispute whether MBP has ever actually resulted in HSV infection in an infant, the record evidence to date clearly establishes that it is biologically plausible that HSV can be transmitted through metzitzah b'peh – so that if an infected person performs the ritual, the risk of transmission is real. The Department's five infectious disease experts, as well as Dr. Thomas Farley, its Commissioner, provided written testimony that direct oral suction puts infants at heightened risk for HSV infection and that the risk of such transmission is incontrovertible. Dr. Anna Wald, who among other qualifications assists in drafting guidelines on the management of HSV infection for the Centers for Disease Control and Prevention, characterizes the evidence linking direct oral suction with neonatal infection as "strong, consistent, and more than biologically plausible." J.A. 304. Finally, the American Academy of Pediatrics, the Infectious Diseases Society of America, the Pediatric Infectious Diseases Society, and

9

the American Sexually Transmitted Diseases Association submitted their views, as amici curiae, in the district court, stating that "it is incontrovertible that infectious diseases can be, and have been, transmitted" through MBP, "and that direct oral suction increases the risk that a neonate will acquire herpes simplex virus . . . and other communicable diseases." Dist. Ct. Dkt. 36, at 1.

In addition to these expert declarations, the Department conducted a study on neonatal HSV infection associated with MBP and published that study in the federal Centers for Disease Control and Prevention's Morbidity and Mortality Weekly Report ("MMWR Study"). Susan Blank *et al.*, *Neonatal Herpes Simplex Virus Infection Following Jewish Ritual Circumcisions that Included Direct Orogenital Suction – New York City, 2000-2011*, 61 Morbidity & Mortality Weekly Rep. 405 (June 8, 2012). In this study, the Department identified 11 confirmed cases of neonatal herpes infection in infants born in the City between 2000 and 2011 who had undergone a circumcision that definitely or likely involved direct oral suction. Two of these infants died. As evidence of a causal link between MBP and infection in these infants, the study cited (among other things) the timing of symptom onset and a cluster of three cases related to a single mohel who, 97 days after two of the cases, tested positive to HSV-1 antibodies, but negative to evidence of virus in the mouth. The MMWR Study

10

calculated the rate of herpes infection following direct oral suction for infant males born in New York City to be one in 4,098, a rate the study concluded was three to four times greater than for males born in New York City who did not have direct oral suction.

Plaintiffs do not challenge the Department's experts or the medical organizations who affirm that MBP places infants at increased risk of HSV infection, conceding that it is "biologically plausible" for the herpes simplex virus to be transmitted through oral contact with an open wound. They focus, instead, on a narrow point: that the Department has presented no DNA proof (presumably based on the comparison of virus present in a mohel and in an infected infant) establishing that HSV has ever been transmitted via MBP.[4] They also challenge the *degree* of risk involved, claiming that the Department has failed to show even a statistical correlation between metzitzah b'peh and HSV infection. They attack, in particular, the conclusions drawn in the Department's MMWR Study.

Plaintiffs' primary medical expert in the district court, Dr. Daniel Berman,

---

[4] The Department counters that such evidence is both unnecessary to establish the likelihood of transmission via MBP and difficult to obtain, given that infected adults shed virus (so that its DNA is accessible via testing) only intermittently and unpredictably. Such testing, the Department points out, would also require the cooperation of individuals who are being investigated as the potential source of an infant's infection.

criticized the MMWR Study on multiple grounds. First, he asserted that, contrary to the Department's claims, the MMWR Study contains insufficient evidence to conclude that the link between MBP and HSV transmission is not just biologically plausible, but has resulted in actual infections. Berman charged in an affidavit submitted in support of the plaintiffs' motion for injunctive relief that the MMWR Study, among other flaws, does not sufficiently rule out alternative modes of HSV transmission, including from household sources, in the 11 cases on which it relies.[5] Further, Berman asserted that the MMWR Study's statistical analysis is flawed because it significantly underestimates the total number of infants upon whom MBP is performed each year in New York City – the denominator in the study's calculation of the rate of HSV infection following MBP. A supporting affidavit contends that after correcting for this asserted flaw, the MMWR Study's finding of a statistically significant link between MBP and HSV infection among infants in New York City is

---

[5] In a supporting affidavit, Dr. Brenda Breuer, Director of Epidemiologic Research at the Department of Pain Medicine and Palliative Care of the Beth Israel Medical Center, alleged that the MMWR Study also insufficiently accounts for the possibility of transmission through hospital sources. The record contains responsive affidavits submitted by the Department in which its experts contend that the MMWR Study adequately accounts for alternate transmission routes and, indeed, that it provides compelling evidence of a causal link between MBP and HSV infection in the cases on which it relies.

eliminated.

### C. Background to the Regulation

Before the Department promulgated the Regulation, it pursued several educational measures designed to disseminate information concerning the risks of MBP. First, beginning in 2005, Department officials participated in meetings with leaders of the Jewish community to discuss HSV infection associated with direct oral suction during circumcision. Then, in August 2005, then-Mayor Michael Bloomberg and then-Commissioner Thomas Frieden met with a group of prominent rabbis and religious leaders to discuss the Department's investigation into the issue.

Later that year, in December 2005, the Department began distributing (via hard copy to the general New York City population and on its website) "An Open Letter to the Jewish Community from the New York City Health Commissioner" ("Open Letter"). The Open Letter stated the Department's position that MBP had infected several infants in New York City with the herpes virus, including one child who died. The letter cited peer-reviewed scientific studies asserting an association between MBP and HSV transmission to infants and, in addition, recommended that infants being circumcised not undergo MBP. The Department also distributed a fact sheet entitled "Before the Bris: How to Protect Your Infant Against Herpes Virus

Infection Caused by *metzitzah b'peh*," which contained similar information, along with a warning that "[b]ecause there is no proven way to reduce the risk of herpes infection posed by *metzitzah b'peh*, the Health Department recommends that infants being circumcised not undergo *metzitzah b'peh*." Finally, the Department distributed a health alert online and via the Department's Health Alert Network, which has approximately 22,300 subscribers, alerting physicians to the issue.

Acting in parallel with the Department's efforts to combat the risk of HSV transmission through MBP, the New York State Department of Health took up the issue in 2006 in an unsuccessful effort to adopt a regulatory protocol. New York State officials met with religious leaders and Department officials before proposing a protocol whereby mohelim would undergo testing if an infant on whom they performed MBP became infected with HSV within a time period compatible with transmission via metzizah b'peh. The protocol would have required that the mohel stop performing MBP and undergo serological testing to determine whether he was infected with the virus. If so, then the mohel and any of the infant's primary caregivers who were infected with the virus would be required to conduct daily mouth swabs in an effort to recover the virus. If the mohel was shown to have the virus with DNA identical to the virus recovered from the infant, the mohel would be

14

deemed the source and banned for life from performing MBP. If the mohel could not be definitively ruled out as a source of the virus, he would be permitted to continue to perform MBP only if he took antiviral prophylaxes drug tablets on a set schedule. Although endorsed by some 57 New York counties, along with numerous leaders in the Jewish community, including 28 rabbis, New York State's protocol was rejected by New York City's Department of Health and Mental Hygiene, in part on the ground that the effectiveness of the protocol's measures to prevent HSV transmission during MBP has not been established. The State has since abandoned the protocol.

After further back-and-forth between interested parties, in June 2012, the Department disseminated and posted online an official statement regarding the risk of HSV transmission from MBP. The statement reiterates the Department's commitment to working with "health care providers, the community, and parents to prevent HSV-1 infection among newborn males undergoing ritual Jewish circumcision." J.A. 675. It asserts that "circumcision should always be done under sterile conditions" and "strongly advises that *metzitzah b'peh* with direct oral suctioning of the circumcision wound [should] never be performed." J.A. 675.

On the one hand, the Department has characterized its educational efforts as a qualified success. It has asserted in this litigation that its message has reached a

15

significant portion of the Orthodox Jewish community (a belief formed in part based on the volume of complaints made to the Department objecting to its involvement in MBP). On the other hand, Department officials contend that a serious health risk remains, despite the educational campaign, because MBP continues to be practiced. While readily admitting that the practice of MBP may persist in part because parents fully aware of the medical information choose to disregard it, the Department also contends, troublingly, that it has received "complaints from parents after their infant had a circumcision that included direct oral suction without [the parents'] prior knowledge or permission that [metzitzah b'peh would be performed]." J.A. 399.

## D. The Regulation

After determining that the extensive educational outreach was not sufficient to address the risk presented by MBP, in June 2012, the Department proposed the presently challenged Regulation. On September 13, 2012, after an opportunity for public comment, New York City's Board of Health voted unanimously to adopt it. Section 181.21 prohibits a person from performing oral suction during a circumcision unless that person obtains signed consent from a parent or guardian of the infant

16

being circumcised.[6] This consent form must be of a type provided by the Department or prescribed by the Department and it must be labeled "Consent to perform oral suction during circumcision." The consent form must contain the following statement: "I understand that direct oral suction will be performed on my child and that the New York City Department of Health and Mental Hygiene advises parents

---

[6] As adopted, § 181.21, entitled "Consent for direct oral suction as part of a circumcision," provides as follows:

> (a) Direct oral suction means contact between the mouth of a person performing or assisting in the performance of a circumcision and an infant's circumcised penis.
> (b) Written consent required. A person may not perform a circumcision that involves direct oral suction on an infant under one year of age, without obtaining, prior to the circumcision, the written signed and dated consent of a parent or legal guardian of the infant being circumcised using a form provided by the Department or a form which shall be labeled "Consent to perform oral suction during circumcision," and which at a minimum shall include the infant's date of birth, the full printed name of the infant's parent(s), the name of the individual performing the circumcision and the following statement: "I understand that direct oral suction will be performed on my child and that the New York City Department of Health and Mental Hygiene advises parents that direct oral suction should not be performed because it exposes an infant to the risk of transmission of herpes simplex virus infection, which may result in brain damage or death."
> (c) Retention of consent forms. The person performing the circumcision must give the parent or legal guardian a copy of the signed consent form and retain the original for one year from the date of the circumcision, making it available for inspection if requested by the Department.

Notice of Adoption of an Amendment to Article 181 of the New York City Health Code, The City Record, Sept. 21, 2012, at 2600; S.A. 4.

that direct oral suction should not be performed because it exposes an infant to the risk of transmission of herpes simplex virus infection, which may result in brain damage or death." The Regulation requires that the person conducting the circumcision give the parent or guardian a copy of the signed consent form and retain the original for one year.

There is no dispute that § 181.21 was promulgated to regulate the religious practice known as metzitzah b'peh and no other circumcision practice. The Regulation's statement of basis and purpose frankly avers that the Regulation is designed to regulate "[a] practice known as metzitzah b'peh." J.A. 96. Furthermore, the Department's Deputy Commissioner has described the Regulation as an effort to "regulat[e] how part of a religious procedure is done," Compl. 7, and the Department conceded below that MBP, a religious practice, "prompted" § 181.21's enactment, Dist. Ct. Dkt. 34 at 6, 9 & n.8. Finally, the City has admitted that § 181.21 exclusively regulates metzitzah b'peh and not secular conduct, noting that MBP is "the only presently known conduct" covered by the Regulation. *Id.* at 6.

### E. Procedural History

Plaintiffs filed suit in the United States District Court for the Southern District of New York seeking declaratory and injunctive relief. Plaintiffs also sought a

18

preliminary injunction pending adjudication of their claims. They argued that forcing mohelim to comply with § 181.21 violates their rights to free speech and free exercise under the First Amendment of the United States Constitution, as well as their right to free exercise under New York law.

The district court denied the preliminary injunction on January 10, 2013.Although the district court held oral argument on the motion, there was no evidentiary hearing and no discovery was taken. As relevant here, the district court denied the preliminary injunction, holding that the plaintiffs had not shown a likelihood of success on the merits of their free exercise claim, because the Regulation is a neutral and generally applicable law pursuant to *Smith* and *Lukumi* and thus subject only to rational basis review. The court emphasized the legitimate governmental interest in safeguarding children's health and protecting parents' right to make informed decisions about their children's care, and discerned no discriminatory object against religion in general or Judaism in particular in the Regulation. The court also determined that the regulation is neither over- nor underinclusive in relation to its secular goals. The district court concluded that the Regulation was likely to survive rational basis review and that the plaintiffs had therefore shown no likelihood of success on the merits. Accordingly, the district

court denied plaintiffs' motion for a preliminary injunction. Plaintiffs timely appealed.

## DISCUSSION

"We review the denial of a preliminary injunction for abuse of discretion." *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009). "A district court abuses its discretion when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *Vincenty v. Bloomberg*, 476 F.3d 74, 83 (2d Cir. 2007) (internal quotation marks omitted). Generally, to obtain a preliminary injunction, a plaintiff must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (quoting *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011)) (internal quotation marks omitted). But "[w]hen, as here, the preliminary injunction 'will affect government action taken in

20

the public interest pursuant to a statutory or regulatory scheme,' it 'should be granted only if the moving party meets the more rigorous likelihood-of-success standard."  *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (per curiam) (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)).  The party seeking a preliminary injunction must also demonstrate "that the public's interest weighs in favor of granting an injunction."  *Id*. (quoting *Metro. Taxicab Bd. of Trade*, 615 F.3d at 156).

\* \* \*

The Free Exercise Clause of the First Amendment, applied against the states by incorporation into the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment prohibits all "governmental regulation of religious beliefs as such." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963).  Further, the government may not compel affirmation of religious belief, *see Torcaso v. Watkins*, 367 U.S. 488, 496 (1961), punish the expression of religious doctrines it believes to be false, *see United States v. Ballard*, 322 U.S. 78, 86-

21

88 (1944), impose special disabilities on the basis of religious views or religious status, *see McDaniel v. Paty*, 435 U.S. 618, 629 (1978), or lend its power to one or the other side in controversies over religious authority or dogma, *see Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445-47 (1969).

In addition to belief, the Free Exercise Clause also protects the performance of (or abstention from) physical acts that constitute the free exercise of religion: "assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Smith*, 494 U.S. at 877. As the Supreme Court has instructed, however, the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)) (internal quotation marks omitted). Such laws are subject to rational basis review. *See Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d Cir. 2012). A law burdening religious conduct that is *not* both neutral and generally applicable, however, is subject to strict scrutiny. *Lukumi*, 508

22

U.S. at 531-32, 546. "Neutrality and general applicability are interrelated," and "the failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531.

Under *Smith* and *Lukumi*, the district court concluded that § 181.21 is both neutral and generally applicable and thus subject only to rational basis review. We disagree. For the reasons set forth herein, the Regulation is neither neutral nor, on this record, generally applicable, and thus must be afforded heightened scrutiny. Accordingly, the district court's holding to the contrary is an error of law requiring vacatur.

**A. Neutrality**

A law is not neutral, the Supreme Court has said, if it is "specifically directed at [a] religious practice." *Smith*, 494 U.S. at 878. To determine neutrality, we begin with the statute's text, "for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. "Facial neutrality is not determinative," however, because the neutrality requirement extends beyond facial discrimination. *Id.* at 534. "Official action that *targets religious conduct for distinctive treatment*" must also satisfy strict scrutiny. *Id.* (emphasis added). Thus, the ordinances at issue in *Lukumi* – ordinances regulating animal slaughter – were not

23

neutral for free exercise purposes because they were "gerrymandered with care to proscribe religious killings of animals [by Santeria church members] but to exclude almost all secular killings." *Id.* at 542. And as noted by the concurrence in *Lukumi*, that the *Lukumi* ordinance "target[ed] the practices of a particular religion" distinguished it from the neutral controlled substances law in *Smith*. *Id.* at 557 (Scalia, J., concurring in part and concurring in the judgment).

Under the principles of neutrality outlined by the Supreme Court in *Smith* and *Lukumi*, § 181.21 of the New York City Health Code is not a neutral law and is therefore subject to heightened scrutiny. The Regulation *purposefully* singles out religious conduct performed by a subset of Orthodox Jews. And the Regulation applies *exclusively* to the religious conduct performed by this religious group. Thus, while the interests at stake in this litigation are serious on *both* sides, requiring the most careful calibration, the *method* for this calibration cannot be a mere rational basis. Strict scrutiny must be applied.

Beginning with the minimum requirement of facial neutrality – that a law not facially regulate "a religious practice without a secular meaning discernible from the language or context," *see Lukumi*, 508 U.S. at 533 – it is doubtful that the Regulation satisfies even this minimum requirement. The very title of the Regulation – "Consent

24

for direct oral suction as part of a circumcision" – reflects the Regulation's focus on a practice only known to take place as part of the bris milah, and exclusively as ritually practiced by a subset of Orthodox Jews. The Regulation, moreover, by its very terms, regulates only "[a] person" who is to "perform a circumcision that involves direct oral suction" – plainly, a mohel performing MBP.

There is no doubt that if the Department had drafted its regulation to require "mohelim" to obtain a consent form before performing "metzitzah b'peh" during "bris milah," this regulation would trigger strict scrutiny no less than the hypothetical statutes referenced in *Smith* – statutes prohibiting "the casting of statues that are to be used for worship purposes" or "bowing down before a golden calf."[7] *See Smith*, 494 U.S. at 877-78 (internal quotation marks omitted). On its face, a regulation directed at metzitzah b'peh would apply only to religious actors performing a religious practice, and during a religious ceremony. But given the Department's candid admission that the purpose here is to regulate MBP and that the only conduct known to implicate the Regulation *is* MBP, it is unlikely the Department

---

[7] As the Department points out, § 181.21 is different because it "does not ban, prohibit, or otherwise prevent people who wish to continue to engage in direct oral suction as part of their ritual circumcision, from doing so." But this factor does not go to whether strict scrutiny is appropriate, but to whether the Regulation will survive strict scrutiny because it is narrowly tailored.

can avoid strict scrutiny simply by declining to call metzitzah b'peh by its name in the Regulation's text.

We need not decide whether the Department's Regulation is facially neutral, however, because it is abundantly clear that the Regulation is not neutral in "operation," as assessed in "practical terms." *Lukumi*, 508 U.S. at 535-36 (noting that "effect of a law in its real operation is strong evidence of its object"). As a *practical* matter, § 181.21 – just like the ordinances in *Lukumi* – is not neutral because the religious ritual it regulates is "the only conduct subject to" the Regulation, which was "drafted . . . to achieve this result." *Lukumi*, 508 U.S. at 535; *see also Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1298 n.10 (7th Cir. 1996) (noting that "[a] regulation that prohibited all private groups from displaying nine-pronged candelabra may be facially neutral, but it would still be unconstitutionally discriminatory against Jewish displays"). The Court in *Lukumi* undertook to "survey meticulously" the categories reflected in the challenged ordinances there to apply appropriate scrutiny to them. *Lukumi*, 508 U.S. at 534 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)). Here, the question whether the Regulation singles out the religious practice of metzitzah b'peh is simpler to address in light of the Department's own admission that metzitzah b'peh "prompted"

26

§ 181.21 and that metzitzah b'peh is "the only presently known conduct" covered by the Regulation, Dist. Ct. Dkt. 34 at 6, 9 & n.8.

Section 181.21's sharp contrast to the neutral law upheld in *Smith* and strong similarities to the non-neutral law in *Lukumi* further demonstrate that the Regulation is not neutral for free exercise purposes. First, § 181.21 is decidedly not like the neutral statute at issue in *Smith*, nor does it fit within the cases *Smith* cites as involving neutral laws. The statute in *Smith* prohibited the use of peyote *both* when it was used for secular purposes and when it was used as a religious sacrament. *Smith*, 494 U.S. at 878-79. The Court reasoned that because the statute was "concededly constitutional as applied to those who use the drug for other reasons," the *Smith* plaintiffs were not constitutionally entitled to a religious exemption from a law that was valid as applied to non-religious uses. *Id.* at 878. Similarly, every single case cited by the *Smith* Court to demonstrate that the Court has "consistently held that the right to free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes . . . conduct that his religion prescribes,'" involved laws encompassing *both* secular and religious conduct. *Id.* at 879-80 (citing *Prince v. Massachusetts*, 321 U.S. 158 (1944) (prohibiting child labor primarily in the secular context); *Braunfeld v.*

27

*Brown*, 366 U.S. 599 (1961) (plurality opinion) (Sunday-closing laws prohibiting stores from opening on Sunday regardless whether religious, family, or business reasons motivated the desire to be open); *Gillette v. United States*, 401 U.S. 437 (1971) (noting that Selective Service System exemption requiring objectors to object to "war in any form" applied regardless whether religious or other moral grounds motivated opposition to a particular war); *United States v. Lee*, 455 U.S. 252 (1982) (Social Security law applied generally to those of all covered employers and employees, regardless of religion)). There can be no argument that child labor prohibitions, Sunday-closing laws, mandatory military service, and tax collection extend well beyond isolated groups of religious adherents. But in contrast to the laws in *Smith* and every case cited therein, § 181.21 purposely and exclusively regulates particular religious conduct and nothing else.[8]

In contrast, § 181.21 is in key respects similar to the targeted non-neutral law in *Lukumi*. The Court held that the ordinances in *Lukumi*, which prohibited ritual

---

[8] In *Smith*, to determine whether the law was neutral and generally applicable, the Supreme Court also looked to two free speech cases involving burdens imposed on the press. The Court explained that a "general tax" or other burden applicable to all businesses is wholly constitutional even when applied to newspapers, *Smith*, 494 U.S. at 878 (citing *Citizen Pbl'g Co. v. United States*, 394 U.S. 131 (1969)), while a tax applicable only to newspapers presents another question, *id.* (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936)). Section 181.21 is akin to the tax in *Grosjean* – it applies only to religious conduct – and is unlike the tax in *Citizen Publishing* that applied to businesses generally.

animal killing, were non-neutral and targeted because their burden fell on "almost" no one but the disfavored religious group. *Lukumi*, 508 U.S. at 536. Similarly here, the burdens of the Regulation fall on only a particular religious group – and in fact *exclusively* on members of one particular subset of that religious group. *Cf. Commack Self-Serv. Kosher Meats, Inc.*, 680 F.3d at 211 (holding that a Kosher food labeling act was a neutral law subject to rational basis because it applied to "food purchased by individuals of many different religious beliefs," while the laws subject to strict scrutiny in *Lukumi* "were clearly enacted in response to a particular church practicing a religion which required animal sacrifice").

Applying strict scrutiny to this Regulation, moreover, does not give rise to the same costs that were present in *Smith*. The Court explained in *Smith* that the workability of a democratic government requires that general laws not be subject to strict scrutiny whenever challenged on religious grounds lest every citizen "become a law unto himself." 494 U.S. at 885 (internal quotation marks omitted). The teaching of *Smith* is that a state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption. *See id.* at 888 ("Any society adopting" a rule to the contrary "would be courting anarchy.").

29

But *Smith* is inapplicable here: the plaintiffs are not requesting an exemption from a law that is otherwise valid when applied to secular conduct. Instead, they challenge a law that purposely and exclusively applies only to them, as religious actors conducting a religious ritual. To be clear, § 181.21 is *not* invalid for this reason, for it may be consistent with free exercise principles to regulate conduct that is only done for religious reasons, in appropriate cases. But where such purposeful and exclusive regulation exists – where the object of the law is itself the regulation of religious conduct – the law is subject to heightened scrutiny, and not to rational basis review. *Lukumi*, 508 U.S. at 533 (noting that such laws must be "justified by a compelling interest and [be] narrowly tailored to advance that interest").

## B. General Applicability

Although not necessary to our holding (because the Regulation is not neutral), we are also unable to conclude, based on the record to date, that § 181.21 is a generally applicable law. The general applicability requirement prohibits the government from "in a selective manner impos[ing] burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. It "protect[s] religious observers against unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being

30

pursued only against conduct with a religious motivation." *Id.* at 542-43 (internal quotation marks and citation omitted) (first alteration in original). While "[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* at 542. A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it. *Id.* at 535-38.

In light of the sparse record at this preliminary stage, we cannot conclude that § 181.21 is generally applicable. Pertinently, the Regulation applies exclusively to religious conduct implicating fewer than 10% of the cases of neonatal HSV infection, while it "fail[s] to [regulate] nonreligious conduct" accounting for all other cases. *Lukumi*, 508 U.S. at 543. Yet, the record is almost entirely devoid of explanation, much less evidence in support of explanation, for such selectivity. There may be reasons for selectively focusing on MBP – perhaps the risks of infection from caregivers in the home or hospital are too diffuse to address, for instance, or are not as grave. At oral argument, the Department asserted that its officers lecture doctors during hospital rounds about the risk of intrapartum transmission from mother to

infant.[9] The record is largely silent, however, regarding these lectures, or why they are sufficient (or the most, practically speaking, that can be done) both to deal with the most common route of neonatal infection and adequately to advise parents about preventable transmission risks.

The Department may have legitimate reasons for addressing HSV infection risk among infants primarily, if not exclusively, by regulating MBP, even though such conduct constitutes a small percentage of the overall number of cases. On the present record, however, the plaintiffs have made a sufficient case for strict scrutiny by establishing that the risk of transmission by reason of metzitzah b'peh has been singled out. To be clear, this does not mean that the Regulation is not narrowly tailored – a factor relevant in the *application* of strict scrutiny, and not to the question whether strict scrutiny applies. We decide only that there is an insufficient basis on which to conclude, on the present record, that § 181.21 is a generally applicable law. In such circumstances, the Regulation is properly subject to strict scrutiny and not rational basis review.

---

[9] As already noted, 85% of the cases of neonatal HSV involve intrapartum transmission from mother to infant and such transmission, in the words of the Department's expert, "is most likely to occur when the maternal infection is acquired during the last trimester of pregnancy." J.A. 316.

* * *

The Department contends that its interest in § 181.21 is solely to protect the health of infants and "to inform parents of the risks inherent in a practice [direct oral suction] that medical authorities would deem risky under any circumstances." But even assuming (without deciding) that this is the case, close scrutiny of laws singling out a religious practice for special burdens is not limited to the context where such laws stem from animus, pure and simple. *See Shrum v. City of Coweta*, 449 F.3d 1132, 1144 (10th Cir. 2006) (noting that "Free Exercise Clause is not limited to acts motivated by religious hostility," but protects "the 'free exercise of religion' from unwarranted governmental inhibition whatever its source"). Instead, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546.

Of course, the conclusion that the Regulation is subject to strict scrutiny does not mean that § 181.21 is constitutionally deficient, for strict scrutiny is not invariably fatal in the context of free exercise claims. *See, e.g.*, Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vand. L. Rev. 793, 858-62 (2006). The Department has asserted interests that are substantial and may prove, on analysis, to be compelling. And the means it has chosen to

33

address these interests (means that fall short of outright prohibition of MBP and that may further the goal of informed parental consent) may be appropriately tailored, albeit intrusive on a longstanding religious ritual. Mindful of the serious interests at stake on both sides, we express no view as to whether the plaintiffs have borne their burden of establishing a likelihood of success on the merits.

As discovery has begun, upon remand the district court should in its discretion permit an additional period of discovery before holding an evidentiary hearing on the present motion. The district court may also consider the advisability, in the interests of judicial economy, of consolidating this hearing with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Any further appeal in this matter shall be assigned to this panel. We are confident that further review by this Court will benefit from the district court's analysis in the first instance.

**CONCLUSION**

The judgment of the district court is VACATED and the case REMANDED for further proceedings consistent with this order. The plaintiffs' renewed request at oral argument for a temporary stay of enforcement is denied.