*Care One, LLC v. NLRB*

# In the
# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2024

No. 23-7475-cv

CARE ONE, LLC, HEALTHBRIDGE MANAGEMENT, LLC, CARE REALTY, LLC, 107 OSBORNE STREET OPERATING COMPANY II, LLC, D.B.A. DANBURY HCC, 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, D.B.A. LONG RIDGE OF STAMFORD, 240 CHURCH STREET OPERATING COMPANY II, LLC, D.B.A. NEWINGTON HEALTH CARE CENTER, 1 BURR ROAD OPERATING COMPANY II, LLC, D.B.A. WESTPORT HEALTH CARE CENTER, 245 ORANGE AVENUE OPERATING COMPANY II, LLC, D.B.A. WEST RIVER HEALTH CARE CENTER, 341 JORDAN LANE OPERATING COMPANY II, LLC, D.B.A. WETHERSFIELD HEALTH CARE CENTER, 2028 BRIDGEPORT AVENUE OPERATING COMPANY II, LLC, D.B.A. GOLDEN HILL HEALTH CARE CENTER, 745 HIGHLAND AVE OPERATING CO LLC, D.B.A. HIGHLANDS HEALTH CARE CENTER, 162 SOUTH BRITAIN ROAD OPERATING COMPANY II, LLC, D.B.A. RIVER GLEN HEALTH CARE CENTER,
*Plaintiffs-Appellants*,

v.

NATIONAL LABOR RELATIONS BOARD, LAUREN MCFERRAN, IN HER CAPACITY AS A MEMBER OF THE NATIONAL LABOR RELATIONS BOARD, GWYNNE WILCOX, IN HER CAPACITY AS A MEMBER OF THE NATIONAL LABOR RELATIONS BOARD, MARVIN KAPLAN, IN HIS CAPACITY AS A MEMBER OF THE NATIONAL LABOR RELATIONS BOARD, DAVID PROUTY, IN HIS CAPACITY AS A MEMBER OF THE NATIONAL LABOR RELATIONS BOARD, KENNETH R. CHU, IN HIS CAPACITY AS AN ADMINISTRATIVE LAW JUDGE OF THE NATIONAL LABOR RELATIONS BOARD,
*Defendants-Appellees.*\*

---

\* The Clerk of Court is respectfully directed to amend the caption as indicated above.

On Appeal from the United States District Court
for the District of Connecticut

_____

ARGUED: NOVEMBER 12, 2024

DECIDED: FEBRUARY 5, 2026

_____

Before: RAGGI, PÉREZ, and KAHN, *Circuit Judges*.

_____

Plaintiffs, several health care facilities and their affiliates, appeal from an October 4, 2023 order of the United States District Court for the District of Connecticut (Chatigny, *J.*) denying their motion for a preliminary injunction to halt proceedings against them before the National Labor Relations Board ("NLRB") for alleged unfair labor practices. Plaintiffs submit that the district court erred in finding them unlikely to succeed on their claim that the challenged proceedings are *ultra vires* for two reasons: (1) the Administrative Law Judge ("ALJ") who initially presided over their violation proceedings was appointed by an NLRB whose Board lacked a quorum of lawfully appointed members, *see* U.S. Const. Art. II, § 2; and (2) two layers of statutory for-cause removal protection unconstitutionally shielded the ALJ from removal by the President, *see id.* §§ 1, 3. We need not here consider the likelihood of plaintiffs succeeding on the merits of these claims because, in any event, they cannot show the irreparable harm required for injunctive relief.

**AFFIRMED**.

Judge Pérez concurs in a separate opinion.

DANIEL R. BENSON (Christian T. Becker and Amit R. Vora, *on the briefs*), Kasowitz Benson Torres LLP, New York, NY, *for Plaintiffs-Appellants*.

MICHAEL S. DALE (Jennifer A. Abruzzo, Peter Sung Ohr, Nancy E. Kessler Platt, Dawn L. Goldstein, Kevin P. Flanagan, Paul A. Thomas, and Grace L. Pezzella, *on the brief*), National Labor Relations Board, Washington, DC, *for Defendants-Appellees*.

REENA RAGGI, *Circuit Judge*:

Plaintiffs Care One LLC, various other named health care facilities, and their affiliates (collectively "Care One"), appeal from an October 4, 2023 order of the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*) denying their motion for a preliminary injunction to halt proceedings against them before the National Labor Relations Board ("NLRB")[1] for alleged unfair labor practices. *See Care One, LLC v. NLRB*, No. 3:23-cv-00831, 2023 WL 6457641, at * 1 (D. Conn. Oct. 4, 2023). Care One submits that the district court erred in finding it unlikely to succeed on its claim that the challenged proceedings are *ultra vires* in two respects: (1) the NLRB Administrative Law Judge ("ALJ") who presided over Care One's violation proceedings was appointed by a Board that lacked a quorum of lawfully appointed members, *see* U.S. Const. Art. II, § 2; and (2) two layers of statutory for-cause removal protection unconstitutionally shielded the ALJ from removal by the President, *see id.* §§ 1, 3. We need not here consider the likelihood of Care One succeeding on these claims because, in any

---

[1] Hereafter in this opinion, we use "NLRB" to reference the National Labor Relations Board as an agency; we use "Board" to reference the five Board members appointed by the President who head the agency.

event, it cannot show a likelihood of irreparable harm from the continuance of NLRB proceedings in their present posture as required for preliminary injunctive relief. Quite simply, all proceedings against Care One before the challenged ALJ have concluded, and the only pending proceedings are before the Board, all of whose members have now been lawfully appointed, and which is empowered to consider all questions of law and fact *de novo.* Accordingly, the order of the district court denying a preliminary injunction to halt pending NLRB proceedings against Care One is affirmed.

## BACKGROUND

### I. Legal Framework

Before discussing relevant facts, it is useful to summarize the legal context in which they occurred.

The NLRB is an executive agency established by Congress pursuant to the National Labor Relations Act ("NLRA"), *see generally* 29 U.S.C. §§ 151–69, and charged therein with investigating, prosecuting, and adjudicating claims of "unfair labor practice[s]" through administrative proceedings, *id.* § 160. The NLRA provides for the NLRB to be led by a Board comprised of five members, each appointed by the President to a five-year term upon confirmation by the Senate. These members are subject to removal by the President "for neglect of duty or malfeasance in office, but for no other cause." *Id.* § 153(a).

Prosecuting authority for NLRA violations is vested in the NLRB's General Counsel. *See id.* § 153(d). In the first instance, the General Counsel pursues NLRB administrative proceedings before a Board-appointed ALJ, who oversees discovery, develops a factual record, and recommends a disposition to the Board. *See* 29 C.F.R. §§ 102.34, 102.35(a). ALJs may be terminated "only for good cause established and determined by the Merit Systems Protection Board" ("MSPB"), 5 U.S.C. § 7521(a), the members of which may themselves be removed by the

4

President "only for inefficiency, neglect of duty, or malfeasance in office," *id.* § 1202(d); *see also id.* § 1201.

A party whose actions are the subject of NLRB administrative proceedings may request interlocutory Board review of any ALJ decision made in the course of such proceedings. *See* 29 C.F.R. § 102.26. In any event, at the conclusion of proceedings before an ALJ, the Board automatically transfers the case to itself. *See id.* §§ 102.45–.46. Once the Board has transferred the case, a party may take exception to any of the ALJ's factual findings and legal conclusions, all of which are subject to the Board's *de novo* review. *See id.*; *see, e.g., Blue Sch. & Loc. 2110, Tech., Off. & Pro. Union, UAW*, 373 NLRB No. 120, 2024 WL 4346403, at *5–6 (Sept. 27, 2024) (reversing ALJ's factual findings and legal conclusions). During its review of the parties' "timely and proper exceptions," the Board may "reopen the record" and hear testimony or take evidence as if the Board were developing the record in the first instance. 29 C.F.R. § 102.48. Only the Board can render a final decision in NLRB administrative proceedings. *See id.* §§ 102.45–.49.

## II. Factual and Procedural Background

In 2012, the General Counsel filed various administrative complaints of unfair labor practices against Care One, all of which were consolidated and assigned to ALJ Kenneth Chu.[2] Between September 2012 and October 2014, ALJ Chu held 39 days of hearings to develop the factual record as to those allegations.

---

[2] In parallel, the NLRB obtained a preliminary injunction in the United States District Court for the District of Connecticut, which prohibited some Care One facilities from continuing the labor practices alleged to be unfair in the administrative proceedings. *See Kreisberg v. Healthbridge Mgmt., LLC*, No. 3:12-cv-1299, 2012 WL 12929503, at *2 (D. Conn. Dec. 11, 2012), *aff'd*, 732 F.3d 131 (2d Cir. 2013). This action remains pending. *See id.*, 2014 WL 12652479 at *4 (D. Conn. May 30, 2014) ("All further proceedings in this Court are hereby stayed until the appeals are decided."); *see also id.* Min. Entry dated Dec. 2, 2025 (ordering next regular status report).

While these proceedings were ongoing, the Supreme Court decided *NLRB v. Noel Canning*, 573 U.S. 513, 517 (2014), which held three January 2012 presidential recess appointments of Board members invalid, thereby rendering invalid all actions taken by the Board between January 2012 and August 2013, after which the Board again had a quorum of validly appointed members, *see Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 370 (D.C. Cir. 2017). Among those invalid actions was the improperly-constituted Board's July 2012 appointment of ALJ Chu. Within a month of the *Noel Canning* decision, however, on July 18, 2014, a quorum of validly appointed Board members "ratif[ied] *nunc pro tunc* all administrative, personnel and procurement matters approved by the Board or taken by or on behalf of the Board from January 4, 2012 to August 5, 2013," which included the July 2012 appointment of ALJ Chu. J. App'x 65.

No administrative proceedings pertaining to Care One were conducted from 2015 to 2022 due to certain interlocutory appeals and COVID-19-related delays. Proceedings briefly resumed in 2022, but were stayed after Care One obtained an injunction from the United States District Court for the District of New Jersey. *See In re 710 Long Ridge Rd. Operating Co. II, LLC*, 637 F. Supp. 3d 161, 187 (D.N.J. 2022).[3] Some months later, the Third Circuit reversed and vacated that injunction, *see id.* No. 22-3046, 2023 WL 3116434, at *4 (3d Cir. Apr. 27, 2023), whereupon ALJ Chu ordered that administrative proceedings against Care One resume on June 26, 2023.

Two weeks prior to that date, however, Care One brought another action in the District of New Jersey seeking, *inter alia*, a temporary restraining order halting the NLRB proceedings. For the first time, Care One argued that (1) ALJ Chu was not lawfully authorized to conduct NLRB proceedings because he was appointed

---

[3] In the New Jersey case, the parties were litigating the validity and scope of releases that certain plaintiffs had obtained during Chapter 11 bankruptcy proceedings that may have affected the NLRB's ability to pursue alleged unfair labor practice claims. *See id.*

by a Board, the majority of whose members' own appointments were pronounced in violation of the Constitution's Appointments Clause in *Noel Canning*, *see* U.S. Const. Art. II § 2*; and (2) the dual for-cause removal protections afforded ALJs unlawfully infringed on the President's removal powers under the Constitution's Take Care and Vesting Clauses, *see id.* §§ 1, 3. The New Jersey district court denied a temporary restraining order and granted the NLRB's motion to transfer the case to the District of Connecticut, where Care One raised similar arguments in moving for a preliminary injunction. *See Care One, LLC v. NLRB*, 680 F. Supp. 3d 540, 549 (D.N.J. 2023). The Connecticut district court denied a preliminary injunction on the ground "that plaintiffs have not met their burden of demonstrating that their claims are clearly likely to succeed on the merits." *Care One, LLC v. NLRB*, 2023 WL 6457641, at *1. This timely appeal followed.

Meanwhile, NLRB administrative proceedings continued, with ALJ Chu issuing a decision on May 29, 2024, finding Care One to have committed many of the alleged unfair labor practices and recommending various remedial actions to the Board. Soon after, ALJ Chu retired from the NLRB. Meanwhile, the Board entered a *pro forma* order transferring Care One's case to itself, where it presently remains pending after the parties filed several exceptions and cross-exceptions to the ALJ's rulings.

## DISCUSSION

### I. Jurisdiction

At the outset, we note that the NLRB challenges the jurisdiction of the district court and, by extension, this court, to enjoin its pending proceedings against Care One. The NLRB submits that the statute generally affording federal courts jurisdiction to hear "all civil actions arising under" federal law, 28 U.S.C. § 1331, does not obtain where, as here, Congress has provided for the Board itself to review agency actions and that review has not yet resulted in a final order, *see* 29 U.S.C. § 160(e)–(f); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023)

7

(observing that where Congress has provided for review of challenged agency action by a court of appeals "following the agency's own review process," proper inference is that Congress intended to divest district courts of jurisdiction over such actions). The NLRB acknowledges that such channeling does not always preclude the exercise of jurisdiction by district courts. *See Axon Enter., Inc. v. FTC*, 598 U.S. at 180 (recognizing district courts' jurisdiction to hear and resolve constitutional challenges to agency "structure"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) (identifying three questions whose answers could signal that Congress did not intend to preclude court action pending final agency review). Nevertheless, it submits that the district court lacks jurisdiction here because Care One does not challenge the NLRB's fundamental structure in a way that casts doubt on the constitutionality of "all or a broad swath of its work," and the *Thunder Basin* questions do not yield answers supporting the exercise of jurisdiction. Appellees' Br. at 46–47 (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. at 189); *see id.* at 47–50.

In considering this argument, we note that the NLRB does not—and cannot—argue that Care One's appointments and removal challenges fail to present the sort of "case" or "controversy" necessary to support a federal court's exercise of constitutional jurisdiction. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. at 522 (recognizing appointments challenge to present Article III "controversy" even where Board "now unquestionably has a quorum" of properly appointed members); *Seila L. LLC v. CFPB*, 591 U.S. 197, 210–11 (2020) (recognizing standing sufficient for Article III jurisdiction where removal challenge complains of "injury . . . traceable to the decision below" that "would be fully redressed" upon reversal and remand). Nor does the NLRB question the courts' "statutory" jurisdiction to hear Care One's removal-protection challenge. *See Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 416 (2d Cir. 2022) ("[T]here is a distinct difference between jurisdictional questions of a statutory nature and jurisdictional questions of a constitutional nature."). Rather, the NLRB challenges only the courts' statutory

8

jurisdiction to entertain Care One's Appointments Clause challenge before the Board itself issues a final decision.

To rule decisively on that jurisdictional challenge, this court would have to decide whether, and to what extent, recent Supreme Court precedent abrogates our own. *Compare Axon Enter., Inc. v. FTC*, 598 U.S. at 195 (approving collateral review for removal-protection challenge because claim goes to whether "structure . . . of an agency violates the Constitution"), *with Tilton v. SEC*, 824 F.3d 276, 291 (2d Cir. 2016) (holding Appointments Clause challenge "must be resolved in the first instance through agency proceedings"). We would also have to consider the proper reach of supplemental jurisdiction in the circumstances of this case. *See* 28 U.S.C. § 1367(a), (c). Because these questions of "statutory (non-Article III) jurisdiction [are] complex" and because Care One's claims "fail[] on other more obvious grounds"—specifically, Care One's inability to demonstrate irreparable harm in the absence of a preliminary injunction—we deem it preferable in this case to "assume hypothetical jurisdiction" and to affirm the denial of an injunction on that more obvious ground. *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 123 (2d Cir. 2020); *see Springfield Hosp., Inc. v. Guzman*, 28 F.4th at 416 ("When a jurisdictional issue is statutory in nature, we . . . may proceed to dismiss the case on the merits rather than engage with the jurisdictional question.").

## II. Care One Is Not Entitled to a Preliminary Injunction

### A. Standard of Review

"We review a district court's denial of a preliminary injunction for abuse of discretion, examining the legal conclusions underpinning the decision *de novo* and the factual [findings] for clear error." *Green Haven Prison Preparative Meeting of the Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021). Our review is not limited to the precise reasoning of the district court; rather, we may affirm the denial of a preliminary injunction "on any

ground supported by the record." *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 106 (2d Cir. 2025).

> When, as here, a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.

*Friends of the E. Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (internal quotation marks omitted). Because the requirements are conjunctive, a movant must satisfy all three to secure a preliminary injunction.

## B. The Parties' Arguments

Insofar as the district court found Care One not to have satisfied the second requirement—*i.e.*, a likelihood of success on the merits—Care One argues that the court abused its discretion by requiring a showing of "a clear likelihood" of success as opposed to a mere "likelihood" of success, and by failing in any event to explain adequately its likelihood analysis. Appellants' Br. at 26–27, 42–45. Care One submits that this court can itself find all three requirements for a preliminary injunction satisfied.

The NLRB contests each of Care One's arguments. As to the last argument, the NLRB maintains, *inter alia*, that Care One failed to demonstrate the likelihood of irreparable harm necessary for a preliminary injunction. We agree and affirm on that ground without addressing the likelihood of Care One succeeding on the merits of its claims or the weight of the public interest.

## C. The Propriety of First Considering Irreparable Harm

As this court has long recognized, "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (quoting *Faiveley Transp. Malmo AB v.*

*Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999))).  Consistent with this view, we have frequently stated that a party seeking a preliminary injunction "must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quoting *Rodriguez v. DeBuono*, 175 F.3d at 233–34).  Thus, we have routinely—even summarily—upheld the denial of a preliminary injunction based on a movant's failure to demonstrate irreparable harm without considering other requirements for such relief.  *See, e.g.*, *St. Joseph's Hosp. Health Ctr. v. American Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106–08 (2d Cir. 2025) (summary order); *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 33–36 (2d Cir. 2015) (summary order).

This is not to suggest that a court must always consider irreparable harm before likelihood of success on the merits when reviewing the denial of a preliminary injunction.  *See, e.g.*, *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (upholding denial of preliminary injunction, explaining that because district court correctly assessed movants' lack of standing and failure to demonstrate likely success on merits, court would "not reach the issue of irreparable harm").  But it is frequently easier and more prudent to do so.

At the heart of the merits arguments in this appeal are two challenging questions of law: (1) whether error in the initial appointment of an NLRB ALJ by an unlawfully constituted Board, *see NLRB v. Noel Canning*, 573 U.S. at 519, is satisfactorily cured by a lawfully constituted Board's subsequent ratification of that appointment; and (2) whether the statutory removal protections afforded ALJs, both directly by 5 U.S.C. § 7521(a)–(b) and indirectly by *id.* § 1202(d) (pertaining to MSPB members who review ALJ removals) and 29 U.S.C. § 153(a) (pertaining to Board members who approve ALJ removals), unconstitutionally interfere with the President's exercise of executive power conferred by the

11

Constitution, *see* U.S. Const. Art. II, §§ 1, 3.[4] These questions raise significant constitutional issues about the separation of powers, particularly about the President's authority to appoint and control persons serving in the executive branch and about Congress's authority to confirm certain executive appointments and to afford a degree of employment protection to persons serving in the executive branch. Similar issues are presently being litigated in a number of federal cases, with intervening actions by the Supreme Court making it difficult to know what balances are appropriately struck in the various contexts in which they can arise. *See, e.g.*, *Trump v. Wilcox*, 145 S. Ct. 1415, 1416 (2025) (staying district court order enjoining President from removing members of NLRB and MSPB without cause); *accord Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (relying on *Wilcox* to stay judgment permanently enjoining termination of Consumer Product Safety Commission members without cause). *But see Trump v. Cook*, 146 S. Ct. 79, 79 (2025) (reserving decision on motion to enjoin President's for-cause removal of Federal Reserve Board Governor pending oral argument).

To be sure, if this appeal could not be decided without considering the likely merits of Care One's constitutional challenges, this court would have to address these issues, applying presently controlling law to the best of our ability. *See, e.g.*, *Nestor v. Pratt & Whitney*, 466 F.3d 65, 72 n.8 (2d Cir. 2006). However, it is not necessary that we do so here because Care One's inability to show the likelihood of irreparable harm necessary to warrant a preliminary injunction is a straightforward ground for decision at this stage in the case.

---

[4] Care One cites the statutory removal protections afforded MSPB and NLRB members only insofar as they afford an extra layer of protection to ALJs. Nowhere does it argue on appeal that the removal protection afforded Board members is an independent ground to enjoin further proceedings before the Board. We thus deem any such argument waived. *See Torcivia v. Suffolk County*, 17 F.4th 342, 366–67 (2d Cir. 2021).

12

**D. Care One Cannot Show Likely Irreparable Harm in the Absence of a Preliminary Injunction**

In urging irreparable harm, Care One argues that (1) the Supreme Court has recognized that "being subjected to unconstitutional agency authority" in the form of "a 'proceeding by an unaccountable ALJ'" is a "here-and-now injury" that is "impossible to remedy" once the administrative proceeding is over, Appellants' Br. at 60 (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. at 191); and, in any event, (2) it is entitled to the "presumption of irreparable injury" that flows from the violation of certain constitutional rights, *id.* at 61–62 (quoting *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020)). Neither argument persuades.

**1. *Axon Enterprise* Does Not Support a Preliminary Injunction in This Case**

Care One's reliance on *Axon Enterprise* to argue that it has satisfied the irreparable harm requirement for a preliminary injunction is misplaced. As the Tenth Circuit has observed, the Supreme Court in *Axon Enterprise* identified "here-and-now injury" only to address the "strictly jurisdictional question" of whether a litigant could challenge ongoing administrative proceedings collaterally; the Court made no mention of "plaintiffs' entitlement to preliminary injunctive relief." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 758–59 (10th Cir. 2024). Indeed, the phrase "here-and-now injury," as used in *Axon Enterprise*, originated in *Seila Law LLC v. CFPB*. 591 U.S. 197, 212 (2020). *Seila Law* was a case concerned with a party's standing to pursue its claim, not a party's entitlement to equitable relief on that claim. *See id.* at 210–13. It was in identifying standing (a requirement for jurisdiction) that the Supreme Court there observed that when a removal

13

provision "violates the separation of powers it inflicts a here-and-now injury . . . that can be remedied by a court." *Id.* (internal quotation marks omitted).[5]

The Supreme Court thereafter "clarified" that what it said about "here-and-now injury" in *Seila Law* was limited to standing and did not pertain to the propriety of any relief:

> What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction. We held that a plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer . . . . But that holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone.

*Collins v. Yellen*, 594 U.S. 220, 258 n.24 (2021) (citation omitted). This clarifying limitation is properly understood to inform the Court's subsequent use of the "here-and-now injury" phrase quoted from *Seila Law* in *Axon Enterprise*. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th at 759.[6]

---

[5] *Seila Law*, in turn, derived the "here-and-now" language from *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986). While the Court there addressed the merits of a constitutional removal issue, it used the "here-and-now" language only to recognize the ripeness of plaintiff's claim as necessary for jurisdiction. *See id.* (rejecting "argument that consideration of the effect of a removal provision is not 'ripe' until that provision is actually used" and observing that provision at issue "creates the here-and-now subservience to another branch that raises separation-of-powers problems" (internal quotation marks omitted)).

[6] Indeed, in holding that judicial *review*—and not necessarily judicial *relief*—was warranted there lest it "come too late to be meaningful," the Supreme Court in *Axon Enterprise* also said "[t]he limits of that conclusion are important to emphasize." *See* 598 U.S. at 191. It observed that "requir[ing] parties to wait before appealing, even when doing so subjects them to 'significant burdens'" is a reality that "will remain so," and thus

In *Collins*, the Supreme Court also distinguished appointments challenges from removal challenges, observing that while a "constitutional defect in the statutorily prescribed method of [an official's] appointment" may render his actions void, there is "no reason to regard any of the actions taken by [a properly appointed officer] . . . as void" by sole virtue of that officer's purportedly unconstitutional protection from at-will removal.  594 U.S. at 257–58.  In short, unconstitutional removal protection may diminish a person's accountability for his actions, but not necessarily his authority to take such actions.  Thus, our court has held that to prove redressable injury from unconstitutional removal protections, a party must show "that the agency action would not have been taken *but for* the President's inability to remove" the relevant person.  *Cf. Consumer Fin. Prot. Bureau v. L. Offs. of Crystal Moroney, P.C. ("CFPB v. Crystal Moroney")*, 63 F.4th 174, 179–80 (2d Cir. 2023) (emphasis in original) (noting that *Collins* left open possibility of relief if party could show that "unconstitutional provision . . . inflict[ed] compensable harm" on petitioner (alteration in original) (quoting *Collins*, 594 U.S. at 259)), *cert. denied*, 144 S. Ct. 2579 (2024).[7]

---

generally does not support interlocutory review.  *See id.* at 192–93.  The Supreme Court has thus consistently explained that finding a "here-and-now injury" cognizable for jurisdictional purposes is not the same as finding likely irreparable harm warranting interim relief.

[7] A Fifth Circuit panel majority recently concluded otherwise.  *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 775–80 (5th Cir. 2025) (upholding preliminary injunction enjoining NLRB proceedings, finding plaintiffs to have demonstrated likelihood of (1) success on merits of removal challenges to both ALJs and NLRB members; and (2) irreparable harm, observing as to latter that *Axon Enterprise*'s "reasoning [with respect to jurisdiction] fits irreparable harm hand-in-glove: once an unconstitutional proceeding begins, the damage is done").  *But see id.* at 781 (Wiener, J., concurring in part and dissenting in part) (faulting majority for misinterpreting Supreme Court precedent by lowering employer's burden so as not to require them "to allege additional causal harm that they would face if

These distinctions between appointments and removal challenges, and between the allegations of injury sufficient to confer standing (*Seila Law*) or to justify collateral review (*Axon Enterprises*) and the showing of harm necessary to secure relief (*Collins*), apply with particular force to preliminary injunctive relief where the movant's burden is not only to allege plausibly that the charged conduct caused injury, but also to make a showing of "likely . . . irreparable harm." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008); *see generally Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d at 115–16, 118–19 (finding plaintiff satisfied "irreducible constitutional minimum" injury-in-fact requirement for standing but failed to show that injury "cannot be remedied if a court waits until the end of trial to resolve the harm" as required for preliminary injunction (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007))). Care One failed to carry that burden here.

### a. Appointments Challenge

To begin with Care One's appointments challenge, we note at the outset that the NLRB concedes the invalidity of ALJ Chu's initial appointment and, therefore, of his subsequent actions—at least prior to ratification by a lawfully constituted Board. Even assuming that such an improper initial appointment—without regard to subsequent ratification—allowed Care One to demonstrate a likelihood of irreparable harm from any continuation of proceedings before ALJ Chu, Care One is not entitled to a preliminary injunction because it faces no such risk. Care

---

subjected to proceedings before the NLRB board members" and noting that holding creates split "between our circuit and the Tenth, Sixth, and Second Circuits"). The facts in this case are distinguishable from those in *Space Exploration Technologies*, which provided no indication that ALJ proceedings had terminated or that any ALJ had retired. *See id.* at 768–70, 780. In any event, this panel—and the parties in this case—remain bound by the rule expressed in *CFPB v. Crystal Moroney* until that decision is overturned by the Supreme Court or rejected *en banc* by this court. *See, e.g., United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022).

One is not now, and will never again be, before ALJ Chu in any NLRB proceedings, as he has now retired from the agency.

The only proceedings now pending against Care One are being conducted by the full Board, which transferred Care One's case to itself by *pro forma* order dated May 29, 2024. Care One does not dispute that, as of that date, all Board members were lawfully appointed. Rather, Care One submits that ALJ Chu's improper appointment irreparably taints even subsequent proceedings before a lawfully constituted Board so as to warrant a preliminary injunction halting those proceedings. In support, it cites *Lucia v. SEC*, wherein the Supreme Court stated that that "the appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official." 585 U.S. 237, 251 (2018) (internal quotation marks omitted).

*Lucia*, however, identified such a remedy as appropriate in circumstances quite different from those presented here. In *Lucia*, not only had the improperly appointed ALJ ruled on the merits of the case, but also all subsequent SEC administrative proceedings had concluded. In that posture, the Court identified a new hearing by a properly appointed official as the appropriate remedy. *See id.* at 251 & n.5. In so ruling, the Court observed that the "new hearing" could be conducted by either "another ALJ" or "the Commission itself." *See id.* at 251–52. The latter remedy is already effectively available to Care One because, by contrast to the completed SEC proceedings in *Lucia*, NLRB proceedings against Care One are presently pending before the Board.

Moreover, Care One cannot show that proceedings before the Board will likely be tainted by ALJ Chu's wrongful appointment because the Board is statutorily authorized to consider all questions of fact and law *de novo*, and to take further testimony and to hear further arguments as necessary to reach its own final decision. *See* 29 U.S.C. § 160(c); 29 C.F.R. § 102.48. Care One does not assert, and

nothing in the record suggests, that the Board will not here exercise its *de novo* review authority.[8]

Care One has already taken the opportunity to raise exceptions to ALJ Chu's factual findings and conclusions of law before the Board. *See* Respondents' Exceptions to the Administrative Law Judge's Decision and Order at 2–3, *Healthbridge Mgmt. LLC et al.*, No. 34-CA-070823 (NLRB filed Aug. 23, 2024). Indeed, Care One has taken exception to the entire record as a matter of law, relying on the very Appointments Clause argument raised here. *Id.* Thus afforded *de novo* review before the Board, Care One cannot show a likelihood of irreparable harm from ALJ Chu's improper appointment so as to warrant a preliminary injunction halting pending Board proceedings.

### b. Removal Challenge

In its challenge to the dual for-cause protections from removal afforded ALJs, Care One again complains of "being subjected to unconstitutional agency authority." Appellants' Br. at 60 (internal quotation marks omitted). But as already explained, unconstitutional removal protections primarily implicate accountability for, not authority to take, official actions. *See supra* at 14–15 (discussing *Collins v. Yellen*, 594 U.S. at 258 n.24; *CFPB v. Crystal Moroney*, 63 F.4th at 179–80). Thus, to satisfy the irreparable harm requirement for injunctive relief consistent with controlling precedent in this circuit, a party complaining of unconstitutional removal protections must demonstrate—at a minimum—a likelihood that it is or imminently will be subject to actions that would not have been taken but for the President's inability to remove the protected persons. *See CFPB v. Crystal Moroney*, 63 F.4th at 179–80. Because Care One has made no such

---

[8] In any event, any error committed by the Board at this juncture would be reviewable and redressable by this court on direct appeal, mitigating the irreparable element of the asserted harm and, thereby, rendering a preliminary injunction unnecessary. *See* 29 U.S.C. § 160(f).

showing here, it fails to establish that ALJ removal protections will cause it irreparable harm unless pending Board proceedings are enjoined.

### 2. Care One Is Not Entitled to a Presumption of Irreparable Harm

Care One argues that its appointments and removal challenges effectively assert "violation[s] of constitutional rights" sufficient to trigger a "presumption of irreparable injury." *Agudath Israel of Am. v. Cuomo*, 983 F.3d at 636 (internal quotation marks omitted) (addressing Free Exercise Clause challenge to COVID-19 restrictions). It is mistaken.

Constitutional violations—particularly First Amendment violations—have been presumed irreparable when, by their nature, their injury cannot be undone. *See New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (recognizing irreparable harm where plaintiff "seeks to engage in political speech" because "a delay of even a day or two may be intolerable" (internal quotation marks omitted)); *see also Reyes v. City of New York*, 141 F.4th 55, 68 (2d Cir. 2025) (holding that inability to film in police station may result in "actual, imminent, and irretrievable loss" of First Amendment rights). That conclusion, however, does not obtain universally. *See National Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025) (noting that "we have presumed irreparable harm for alleged deprivations of certain constitutional rights," namely in First, Fourth, and Eighth Amendment contexts, but rejecting argument that "violation of constitutional rights per se constitutes irreparable injury" and, thus, declining to decide whether Second Amendment infringement presumptively causes irreparable harm).

We are not persuaded that a presumption of irreparable harm necessarily attaches to all separation-of-powers claims so as to warrant injunctive relief. As both the Supreme Court and our own court have recognized, "the nature of the . . . remedy" available to claimants "is to be determined by the nature and scope of the constitutional violation" that they have sustained. *United States v. City of*

19

*Yonkers*, 197 F.3d 41, 55 (2d Cir. 1999) (quoting *Milliken v. Bradley*, 433 U.S. 267, 280 (1977)); *accord CFPB v. Crystal Moroney*, 63 F.4th at 180 (collecting cases so concluding in identifying "but-for causation" requirement). That reasoning applies whether the relief sought is final or preliminary.

The removal violations at issue do not warrant a presumption of irreparable harm here because, as already explained, such violations do not cause cognizable harm in all instances. *See supra* at 14–15, 18–19. Rather, removal violations cause cognizable separation-of-powers injury only when the person afforded removal protection engages in action that he would not have taken "*but for* the President's inability to remove" him. *CFPB v. Crystal Moroney*, 63 F.4th at 180 (emphasis in original); *see Collins v. Yellen*, 594 U.S. at 258–60. Again, Care One does not claim that ALJ Chu took any actions in its proceedings that he would not have taken but for his removal protections. Now that ALJ Chu has retired and Care One's proceedings are before the full Board, it is not at risk of any such injury from ALJ Chu. In these circumstances, even if Care One were successfully to demonstrate the unconstitutionality of the challenged dual for-cause removal protection afforded ALJs, it would not have sustained irreparable harm. Instead, the only relief to which it would be entitled would be a declaratory judgment severing the unconstitutional removal protections from the broader statutory scheme. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (stating that "unconstitutional tenure provisions are severable from the remainder of the statute").

As for appointments violations, they cause injury to persons compelled to proceed before a challenged appointee. But there is no risk of such injury, much less presumptive irreparable injury, to persons such as Care One because its NLRB proceedings are now before the lawfully appointed Board, which is empowered to conduct *de novo* review of all questions of law and fact. *See supra* section II.D.1.a.

Thus, Care One's appointments and removal challenges warrant no presumption of irreparable injury.

## CONCLUSION

To summarize, Care One has failed to demonstrate the likelihood of irreparable harm required to warrant a preliminary injunction halting proceedings pending against it before the NLRB. The district court having correctly denied such an injunction, its order is hereby **AFFIRMED**.

MYRNA PÉREZ, *Circuit Judge*, concurring:

While I join fully in the well-reasoned majority opinion, I write separately to explain that in my view, Plaintiffs are also unlikely to succeed on the merits, and we should reject the preliminary injunction on that basis.

First, the dual-layer removal protections enjoyed by the NLRB's ALJs do not offend the separation of powers or interfere with the President's exercise of his constitutional duties. Unlike the board members at issue in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the NLRB's ALJs do not exercise significant policymaking or enforcement authority, and the NLRB's Board members are fully empowered to superintend the agency's ALJs and to disregard their recommendations. And second, the appointment of the ALJ who presided over Plaintiffs' case, while initially invalid, was properly ratified, curing any ongoing constitutional injury.

## I. Reaching the Merits to Decide a Preliminary Injunction

While the majority opinion correctly notes that we have said irreparable harm is the most important prerequisite when considering a preliminary injunction, *see* Maj. Op. at 11, we have also often first considered the merits of the claims. *See, e.g.*, *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d

1

144, 153 (2d Cir. 1999) ("Because a likelihood of success has not been shown here, however, we need not decide whether a presumption of irreparable harm would otherwise apply. . . . [A]ny irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success."). I find it particularly appropriate to address the merits where, as here, Plaintiffs' entire theory of irreparable harm is wrapped up in the very theories of constitutional violations they assert. *See* Appellant's Br. at 60–62; *Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) (affirming denial of preliminary injunction on likelihood of merits and holding that because movant "fails to demonstrate a likelihood of success on the merits of his claim that the Naming Provisions violate his First Amendment rights, he cannot establish irreparable harm by this route," and movant "makes no other argument in support of a finding of irreparable injury"); *Ozturk v. Hyde*, 136 F.4th 382, 402 (2d Cir. 2025) (concluding there was no sufficient showing of irreparable harm where "much of the government's irreparable harm argument seems to rely upon its less-than-convincing merits arguments"); *see also Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 759–60 (10th Cir. 2024) (rejecting "here-and-now injury" of being subject to unconstitutional proceedings and reaching the merits to resolve

2

the irreparable harm prong "because Leachco's irreparable harm argument is predicated entirely on its ability to prevail on its constitutional arguments").

Though I recognize the temptation to avoid tackling the merits in this case, it is important not to conflate a trend of animated litigation with law that remains settled. The majority opinion is correct in pointing out that removal protections are currently being litigated throughout federal courts, and that the Supreme Court has sent mixed signals via its interim orders. *See* Maj. Op. at 11–13; *see also infra* Section II.A.3. However, this case does not involve a challenge to the removal protections of top-level agency officials such as the NLRB's Board members themselves. Rather, it is a narrower challenge to the removal protections of the NLRB's ALJs, and those protections stand on firmer ground given existing Supreme Court precedent, even if one accepts that the same protections for top-level officials are recently being called into question. In any event,

> It is not within our purview to anticipate whether the Supreme Court may one day overrule its existing precedent. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."

*United States v. Santiago*, 268 F.3d 151, 155 n.6 (2d Cir. 2001) (Sotomayor, J.) (alterations in original) (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)). Only

3

if—and until—a century of settled law is upended by the Supreme Court, our task in deciding Plaintiffs' merits arguments remains straightforward. We can and should reject them for what they are: without merit.

## II. Likelihood of Success on the Merits

Turning to the merits of Plaintiffs' claims, I conclude that they are unlikely to succeed. At the outset, I note that the District Court misapplied the heightened "clear" or "substantial" likelihood of success standard.[1] Plaintiffs' preliminary injunction arises in the standard prohibitory posture: it is undisputed that Plaintiffs moved for a preliminary injunction as NLRB proceedings were set to resume after having been stayed, and that Plaintiffs sought to enjoin those proceedings from starting up again. *See* J. App'x at 50–51. Rather than request some positive act by the government, Plaintiffs' injunction thus sought to maintain the status quo. *See N. American Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). The District Court instead relied on the *ultimate* relief sought

---

[1] We have said that "when, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous [clear or substantial] likelihood-of-success standard." *Giambalvo v. Suffolk County*, 155 F.4th 163, 174 (2d Cir. 2025) (quoting *Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014)). And whether government action will be affected refers to whether "the injunction sought 'will alter, rather than maintain, the status quo'—*i.e.*, is properly characterized as a 'mandatory' rather than 'prohibitory' injunction." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

in this action—to "render null and void all that has transpired during the hearing before ALJ Chu, and require the NLRB to either start over or abandon the enforcement action"—to justify its application of the heightened standard. *See* J. App'x at 266. The District Court abused its discretion in doing so.

### A. Removal Protections

The Supreme Court has held that, in general, statutes protecting executive officers from at-will removal by the President are unconstitutional.[2] *See Seila L. LLC v. CFPB*, 591 U.S. 197, 215 (2020). But there are two significant exceptions: "for inferior officers with limited duties and no policymaking or administrative authority," *id.* at 218; and "for multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions," *id.* at 217.

On their face, the removal protections at issue here—the good-cause protection for the NLRB's ALJs, combined with the good-cause protection for members of the MSPB—fall comfortably within these exceptions. The NLRB's ALJs are (at most) inferior officers who carry out exclusively adjudicatory

---

[2]     For present purposes, "officers" are distinct from "employees." By definition, in contrast to employees, officers exercise "significant authority" under federal law and are appointed directly by the President, the head of a department, or a court of law. *Lucia v. SEC*, 585 U.S. 237, 245 (2018). The constitutionality of removal protections for federal employees is not in question.

5

functions.[3]  And the MSPB—along with the NLRB's Board—are multi-member bodies with exclusively quasi-judicial and quasi-legislative functions.  Plaintiffs do not argue otherwise.

It is the combination of these removal protections—the so-called "dual layer"—that Plaintiffs argue constitutes an exception to these exceptions.  For this argument they rely on *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), in which the Supreme Court invalidated the good-cause removal protections afforded members of the Public Company Accounting Oversight Board ("PCAOB"), an independent agency within the SEC responsible for regulating the accounting industry.  The PCAOB's members could only be removed for good cause by the SEC, whose own members were removable by the President only for good cause.  *Id.* at 486–87.  Given the PCAOB's status as "the regulator of first resort and the primary law enforcement authority for a vital sector of our economy," *id.* at 508, and the SEC's inability to review and supersede its investigatory decisions, *see id.* at 504, the Court held that two layers of good-cause removal protections "contravene[d] the President's 'constitutional

---

[3]  The parties do not dispute that, following *Lucia*, the NLRB's ALJs are inferior officers.  *See Lucia*, 585 U.S. at 249 (holding that the SEC's ALJs are inferior officers).  I therefore assume that the NLRB's ALJs are inferior officers rather than employees, and refer to them accordingly.

6

obligation to ensure the faithful execution of the laws,'" *id.* at 484 (quoting *Morrison v. Olson*, 487 U.S. 654, 693 (1988)).

The NLRB's ALJs similarly enjoy two layers of good-cause insulation from removal. The ALJs themselves enjoy removal protection, as do members of the MSPB who decide whether good cause has been shown to remove an ALJ. But the NLRB's ALJs are distinguishable from PCAOB members in important respects—most notably, in the nature and extent of the power they wield. Indeed, the Court in *Free Enterprise Fund* took care to note that its holding did not apply to ALJs altogether, many of whom—including the NLRB's—"perform adjudicative rather than enforcement or policymaking functions or possess purely recommendatory powers." *Id.* at 507 n.10 (citations omitted). Unlike PCAOB members, the NLRB's ALJs are not empowered to "determine[] the policy and enforce[] the laws of the United States." *Id.* at 484. And, unlike the investigatory decisions of PCAOB members, each decision rendered by an NLRB ALJ is subject to direct review by principal officers (the Board), who can disregard or overrule them at will.[4]

---

[4] This includes each of an ALJ's procedural and evidentiary rulings, which the Board can review either on an interlocutory appeal or during its plenary review of the ALJ's decision. *See* 29 C.F.R. § 102.26 (2026).

While the Supreme Court has not addressed the question directly, I find that these distinctions are dispositive. My conclusion is compelled both by the constitutional principles underlying the removal power—as informed by the Supreme Court's precedents—and the historical pedigree of the removal protections at issue here. That conclusion is in accord with the vast majority of federal appellate court decisions on the issue. I address each in turn.

### 1. Constitutional Principles

To invalidate a statute insulating an inferior officer from removal, we must conclude that the statute "interfere[s] impermissibly with [the President's] constitutional obligation to ensure the faithful execution of the laws." *Morrison*, 487 U.S. at 693. The faithful-execution requirement is a weighty obligation. It appears twice in Article II: as an affirmative duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and as part of the President's oath of office, in which he must "solemnly swear (or affirm)" to "faithfully execute the Office of President of the United States," *id.* § 1, cl. 8. This requirement derives from the "fiduciary-like" duties of officers in England and the American colonies. Andrew Kent, Ethan J. Leib & Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111, 2180 (2019).

By 1789, "faithful execution" had come to mean, in particular, that officers could not use their powers for personal gain, could not act outside their legal authority, and had "an affirmative duty to act diligently, honestly, skillfully, and impartially in the best interest of the public." *Id.* at 2141. Article II imposes this obligation on the President and requires that he enforce it in his subordinates.

Several constitutional mechanisms help to enforce this obligation, one of which is the possibility of being removed from office. At the highest level, the President fears removal by the electorate.[5] Beneath him, executive officers fear removal by their superiors, including, for some, by the President. In theory, an officer who fears removal will try to perform his job in a way that avoids it.[6] Ideally that means executing the law faithfully, but sometimes it may mean the opposite.

The President's removal power, and statutory limits on that power, balance two opposing risks. On one side is the risk of the maverick officer whose acts put

---

[5] This fear became less potent with the ratification of the Twenty-Second Amendment, which limited a President to two terms in office. *See* Peter M. Shane, *Political Accountability in a System of Checks and Balances: The Case of Presidential Review of Rulemaking*, 48 Ark. L. Rev. 161, 199–200 (1995). The other means of checking the President's power—such as congressional oversight and judicial review—arguably became more important as a result.

[6] For convenience, the pronouns we use borrow their gender from the current President and ALJ Chu.

idiosyncratic preferences or a personal agenda above the public good. That person is tamed by the possibility of at-will removal. On the other side is the sycophantic officer who abuses his discretion in order to help superior officers, including the President, avoid removal themselves—for example, by favoring political allies, covering up failures, or obfuscating the negative effects of certain policies. This risk is mitigated by a degree of insulation from politically motivated removal.

These caricatures, while oversimplified, usefully illustrate when removal protections might "interfere impermissibly with" the President's faithful-execution obligation, *Morrison*, 487 U.S. at 693, and when they might serve it.

### i. *The Maverick*

An officer who serves his own partial or idiosyncratic preferences at the cost of the public good does not faithfully execute the law entrusted to him. This concern animated the Supreme Court's decisions in *Free Enterprise Fund* and *Seila Law*, both of which involved officers wielding substantial policy power who could be removed only for good cause and who were empowered to make decisions that could not individually be overruled. In *Free Enterprise Fund*, it was members of the PCAOB, who could independently initiate investigations and enforcement proceedings. *See Free Enter. Fund*, 561 U.S. at 485, 504. In *Seila Law*, it was the

10

Director of the Consumer Financial Protection Bureau, who was empowered to "*unilaterally*, without meaningful supervision, issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Seila Law*, 591 U.S. at 225.

An officer empowered with sufficient discretion—that is, who is entrusted with judgment as to what the public good requires, and whose decisions on that score are not reviewed by superiors or checked by peers—may fail the faithful-execution requirement without supplying good cause for removal. This is because a bad policy choice will usually not constitute inefficiency, neglect, or malfeasance in office, which is typically what constitutes good cause in removal-protection statutes. *See, e.g.*, 5 U.S.C. § 1202(d). So the threat of removal tames such would-be mavericks only when removal is at-will; when the democratically accountable President can fire (or direct the firing of) the officer over policy disagreements, then the officer is more likely to avoid misguided policies that offend the public. A statute prohibiting at-will removal for such officers may therefore interfere unconstitutionally with the President's duty of faithful execution.

### ii. The Sycophant

The opposite concern is the officer who, fearing removal, abuses his position to serve the personal interests of his superiors—for example, by favoring the President's political allies, punishing dissent, or keeping the administration's failures from public view. He may also neglect or contradict politically unfashionable legal mandates to curry favor with his superiors. Such actions inhibit rather than serve the faithful execution of the law. *See* Kent, Leib & Shugerman, *supra*, at 2141 (noting that Article II's faithful-execution requirement was understood at the framing to prohibit ultra vires acts and to require acting "diligently, honestly, . . . and impartially in the best interest of the public"). The fear of at-will removal—removal for any reason, including an unwillingness to abuse one's office or exceed one's lawful powers—exacerbates this risk.

This concern animated the Supreme Court's decision in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), in which the Court upheld good-cause removal protections for members of the FTC. Describing the FTC as an adjunct of the legislative and judicial branches, it held that the "coercive influence" of the President's asserted at-will removal power would "threaten[]" the FTC's necessary independence. *Id.* at 630. Similarly, in *Wiener v. United States*, 357 U.S.

12

349 (1958), the Court upheld a fixed term for members of the temporary War Claims Commission, whose job was to adjudicate claims for injuries suffered in World War II. The Court assumed, "as one must," that Congress did not intend to allow the President to influence the outcomes of particular adjudications, and concluded that "to have hang over the Commission the Damocles' sword of removal by the President" would contradict that intention. *Id.* at 356. The Constitution did not require disregarding Congress's judgment on that score. *Id.* Indeed, the Supreme Court recognized long ago that the power of removal is "incident to the power of appointment," and thus when Congress, pursuant to Article II, "vests the appointment of inferior officers in the heads of Departments it may limit and restrict the power of removal as it deems best for the public interest." *United States v. Perkins*, 116 U.S. 483, 485 (1886).

The Court later clarified in *Morrison* that the quasi-legislative or quasi-judicial nature of an officer's functions are not dispositive, but might nonetheless characterize offices for which good-cause removal protections might legitimately be "necessary to the proper functioning of the agency or official." *Morrison*, 487 U.S. at 691 n.30. "It is not difficult to imagine situations in which Congress might desire that an official performing 'quasi-judicial' functions, for example, would be

free of executive or political control." *Id.* Put differently, the risk of sycophancy is mitigated by protecting an officer from removal except for good cause, and, depending on the nature of the officer's power, Congress may permissibly decide that such protections are "necessary to" the faithful execution of the law. *Id.*

### iii. The NLRB's ALJs

The precedents animated by these competing risks reflect a core proposition: that the constitutionality of statutory removal protections depends on the nature and extent of the power exercised by the protected officer. Officers who wield significant power, and who wield that power through decisions that are not reviewable by superior officers or checked by peers, will pose greater risks as mavericks compared to other officers, and Article II may require that the President be able to effectuate their removal at will. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 508; *Seila Law*, 591 U.S. at 225. But officers whose roles are chiefly recommendatory— who do not set policy, and whose decisions are individually reviewable by superiors before they are implemented—generally do not pose such a risk. *See Free Enter. Fund*, 561 U.S. at 507 n.10 (excepting ALJs from its holding for that reason). The greater concern is that these officers will unfaithfully execute the laws entrusted to them if left unprotected from personally or politically motivated

removal. For them, good-cause removal protections generally will not "interfere impermissibly with" the President's faithful-execution obligation. *Morrison*, 487 U.S. at 693. Rather, such protections may serve that obligation—or, at least, Congress may logically and permissibly decide that they do. *See Perkins*, 116 U.S. at 485 ("The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed.").

The NLRB's ALJs fall squarely into the latter category. They cannot influence a change in policy, or even adjudicate an enforcement action, without the Board's acquiescence. As a result, the universe of actions that could frustrate the faithful execution of the law, but which would not constitute good cause for removal, is minimal. But an ALJ who fears at-will removal, and thus distorts his factual findings to benefit the President's political allies, for example, executes the law unfaithfully. As the Supreme Court's cases teach us, this risk is particularly acute with respect to adjudicatory officers, whose objectivity and fairness are crucial to their quasi-judicial functions. *See, e.g.*, *Morrison*, 487 U.S. at 691 n.30; *Wiener*, 357 U.S. at 356.

15

The same risk balancing favors permitting removal protections for members of the MSPB, who are responsible for adjudicating whether good cause exists for an ALJ's removal. The efficacy of a good-cause removal protection depends in large part on an officer's confidence that it will be fairly and impartially enforced. If an ALJ, for example, fears political reprisal by a non-insulated NLRB and MSPB under the guise of "good cause," then the protection will be toothless. A non-insulated MSPB might also be coerced by the President to prevent the removal of a sycophantic ALJ when good cause does exist. In either case, the faithful execution of the laws is inhibited, not enhanced. Congress was within its power to address this risk by insulating both the NLRB's ALJs and the MSPB's members from politically motivated removal.

### 2. History and Tradition

I next consider whether the removal protections at issue here have a "foothold in history or tradition," supporting their validity, or whether they are instead a constitutionally suspect "innovation." *See Seila Law*, 591 U.S. at 222. Unlike the novel agency structures at issue in *Seila Law* and *Free Enterprise Fund*, the statutes here have a long history and apply broadly throughout the federal government.

So-called dual-layered removal protections have existed in certain federal agencies since at least the 1880s. In 1883, the Pendleton Act prohibited the removal of civil servants for "refusing" "to contribute to any political fund, or to render any political service." Pendleton Act, Pub. L No. 47-27, § 2, 22 Stat. 403, 404 (1883). This was part of Congress's attempt to reform the spoils system, which had rendered the federal civil service corrupt and ineffective.[7] These removal protections applied as well to agencies whose heads were themselves insulated from removal. This first included the Interstate Commerce Commission ("ICC"), created in 1887, whose members could only be removed by the President for good cause. *See* Interstate Commerce Act, Pub. L. No. 49-104, § 11, 24 Stat. 379, 383 (1887) (allowing the President to remove a commissioner only "for inefficiency, neglect of duty, or malfeasance in office"). The ICC was the archetype for what would become an alphabet soup of multi-member commissions and boards with similar removal protections—among them the NLRB, created in 1935. *See generally Free Enter. Fund*, 561 U.S. at 541 (Breyer, J., dissenting); Michael Asimow, *The*

---

[7]     Under the spoils system, federal jobs were awarded based on political support, and officeholders were expected to make political donations and, often, to use their offices to benefit the President's party. *See* Jerry L. Mashaw, *Creating the Administrative Constitution* 176 (2012). Performance in office—faithful execution of the law—was secondary.

    The Pendleton Act also revived the Civil Service Commission, the predecessor to the MSPB, which had lain dormant since its creation in 1871.

*Administrative Judiciary: ALJ's in Historical Perspective*, 20 J. Nat'l Ass'n Admin. L. Judges 157, 159 (2000).

Many of these agencies carried out adjudicatory functions with the assistance of hearing examiners—the predecessors of modern ALJs—who themselves enjoyed removal protection under the Pendleton Act and its subsequent expansions. *See generally* Michael Bogdanow & Thomas Lanphear, *History of the Merit Systems Protection Board*, 4 J. Fed. Cir. Hist. Soc'y 109, 110–11 (2010) (describing the broadening removal protections afforded civil servants over the next several decades). Removal protections specific to hearing examiners were formalized in 1946 with the enactment of the Administrative Procedure Act ("APA"), which made examiners "removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission [the predecessor to the MSPB]." APA, Pub. L. No. 79-404, § 11, 60 Stat. 237, 244 (1946). The APA also clarified the nature and extent of examiners' powers, which were limited to creating factual records and recommending dispositions to their agency heads, who were free to disregard them.[8] *See id.* § 8(a),

---

[8] This balance—between hearing examiners' removal protections and the extent of their power—represented a compromise between proponents of an expanded administrative state, who supported vesting agencies with robust adjudicatory powers, and skeptics of the New Deal, who worried about concentrating too much power in the executive branch. *See* Asimow, *supra*, at 160–64.

60 Stat. at 242. Both provisions remain substantively unchanged to this day. *See* 5 U.S.C. §§ 557(b), 7521(a).

Removal protections for the adjudicators of "good cause"—currently the MSPB—were put in place by the Civil Service Reform Act of 1978. Pub. L. No. 95-454, § 202(a), 92 Stat. 1111, 1122. The Act, which created the MSPB to take over the adjudicative functions of the Civil Service Commission, responded to widespread concerns that the Commission had been improperly influenced by political pressure. *See* Bogdanow & Lanphear, *supra*, at 112–13, 115; William V. Luneburg, *The Federal Personnel Complaint, Appeal, and Grievance Systems*, 78 Ky. L.J. 1, 18 n.84 (1989). Those removal protections have remained in place for the nearly half-century since.

In sum, the long history of the removal protections at issue here—including the dual layers at the center of Plaintiffs' challenge—distinguish them from the statutory schemes in *Seila Law* and *Free Enterprise Fund* and support their validity.

### 3. State of Play

Even though my view is that the law remains settled and we need not read tea leaves to decide this case, I acknowledge that ongoing legal challenges to removal protections of officers appointed by the President have not yielded

uniform results, as I briefly address below. But to the extent the law is in flux, that flux would be beside the point here. The invalidation of removal protections for members of the MSPB and the NLRB's Board would do nothing more than moot Plaintiffs' removal protections claim regarding the NLRB's ALJs, which is premised on a dual layer of protection that would no longer exist.

### i. The Supreme Court

Some indications suggest that removal protections for top-level agency officials appointed by the President—here, the NLRB's Board and members of the MSPB—may not be long for this world. Although an interlocutory ruling, the Supreme Court recently stayed a court order preliminarily enjoining the President's no-cause removal of members of both bodies. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025). It explained that "[b]ecause the Constitution vests the executive power in the President, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents," and thus "[t]he stay reflects our judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.* at 1416 (citations omitted). The Supreme Court nevertheless made clear that "we do not ultimately decide in this posture whether the NLRB or MSPB

20

falls within such a recognized exception." *Id.*; *see also id.* at 1417–19 (Kagan, J., dissenting) (explaining that *Humphrey's Executor* "remains good law, and it forecloses both the President's firings and the Court's decision to award emergency relief," and that "granting the President's request for a stay is nothing short of extraordinary" because "the order allows the President to overrule *Humphrey's* by fiat, again pending our eventual review").

The Supreme Court in subsequent interlocutory orders has continued to allow the President to remove statutorily protected officers without cause. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("[T]he Consumer Product Safety Commission exercises executive power in a similar manner as the National Labor Relations Board, and the case does not otherwise differ from *Wilcox* in any pertinent respect."); *Trump v. Slaughter*, 146 S. Ct. 18, 18 (2025) (granting stay of order enjoining no-cause removal of FTC commissioner without explanation). But it recently declined to disturb an order enjoining the President from removing a member of the Federal Reserve's Board of Governors. *See Trump v. Cook*, 146 S. Ct. 79 (2025). Perhaps this was because of the Supreme Court's recognition in *Wilcox* that "[t]he Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the

21

United States." 145 S. Ct. at 1417. *But see id.* at 1421 (Kagan, J., dissenting) (observing that "today's order poses a puzzle" because "the Federal Reserve's independence rests on the same constitutional and analytic foundations as that of the NLRB, MSPB, FTC, FCC, and so on—which is to say it rests largely on *Humphrey's*").

The Supreme Court's explicit reservation of the question notwithstanding, *Wilcox*'s reasoning (and its progeny of interlocutory rulings, to the extent they can be characterized as such) has little bearing on this case. *Wilcox* continued to recognize the "narrow exceptions recognized by our precedents," *id.* at 1416 (citing *Seila Law*, 591 U. S. at 215–218), and premised its ruling on the determination that the NLRB and MSPB exercise "considerable executive power," *id.* As explained above, the NLRB's ALJs fit comfortably within those narrow exceptions precisely because they are inferior officers who carry out exclusively adjudicatory functions, as opposed to wielding executive power in any significant manner. The Supreme Court's interlocutory decisions do not support a wholesale rejection of removal

22

protections, let alone undermine the theoretical underpinnings of such protections.[9]

### ii. Our Sister Circuits

Of the federal circuit courts to squarely confront removal protections for ALJs, the Ninth (twice), Tenth, and Eleventh have explicitly held that such protections do not violate Article II, for reasons similar to the foregoing. *See Rabadi v. U.S. Drug Enf't Admin.*, 122 F.4th 371, 375–76 (9th Cir. 2024) (upholding dual-layer DEA ALJ removal protections because "DEA ALJs perform purely adjudicatory functions," because "Congress does not mandate that the DEA use ALJs as presiding officers for administrative hearings," and because their

---

[9] Recent federal circuit court decisions have applied *Wilcox*'s reasoning in challenges to removal protections for the NLRB's Board members. *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 776 (5th Cir. 2025) (affirming grant of preliminary injunction halting NLRB proceedings due to likelihood of success on the merits of constitutional challenge, and distinguishing *Humphrey's Executor* by explaining that "[u]nlike the FTC commissioners in 1935, NLRB Board Members today 'wield substantial executive power'" (footnote omitted) (quoting *Seila Law*, 591 U.S. at 218)); *Harris v. Bessent*, 160 F.4th 1235, 1251 (D.C. Cir. 2025) (invalidating NLRB Board member good-cause removal protection because "Congress has vested the NLRB with several executive powers beyond the ones addressed in *Humphrey's Executor*"). Like *Wilcox* however, all agree that *Humphrey's Executor* is still good law. *See Space Expl. Techs. Corp.*, 151 F.4th at 776–77 (recognizing that "*Humphrey's Executor* carved out an '"exception" to the general "rule" that lets a president remove subordinates at will'" and that the "contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court" (quoting *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352–53 (5th Cir. 2024))); *Harris*, 160 F.4th at 1248–49 (recognizing that "we must apply *Humphrey's Executor* as best we can, unless and until the Supreme Court overrules it" and that the NLRB and MSPB's powers "fall outside any exception based on that decision"); *see also Wilcox*, 145 S. Ct. at 1419 (Kagan, J., dissenting) ("[L]ower courts recently faced with challenges to independent agencies' removal provisions have uniformly rejected them based on *Humphrey's*."); *Harris*, 160 F.4th at 1258 (Pan, J., dissenting) ("[M]y colleagues make us the first court to strike down the independence of a traditional multimember expert agency . . . ."). For the same reasons *Wilcox* is inapposite, these circuit court cases are inapposite here.

"decisions are reviewed de novo by the DEA Administrator" (citing *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133–35 (9th Cir. 2021))); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 764 (10th Cir. 2024) (upholding dual-layer CPSC ALJ protections because the ALJ in question "performed 'a purely adjudicatory function'" and "Congress did not statutorily require that the CPSC use ALJs for administrative adjudications"); *Walmart, Inc. v. Chief Admin. L. Judge of the Off. of the Chief Admin. Hearing Officer*, 144 F.4th 1315, 1343–45 (11th Cir. 2025) (upholding dual-layer OCAHO ALJ protections because such ALJs have "only adjudicative functions" and have "essentially no power to render a final decision on behalf of the United States unless permitted to do so by the Attorney General").

Only the Fifth Circuit has held otherwise. In *Jarkesy v. SEC*, a divided panel explained that "[i]f principal officers cannot intervene in their inferior officers' actions except in rare cases, the President lacks the control necessary to ensure that the laws are faithfully executed," pointing out that the SEC ALJs in question "exercise considerable power over administrative case records by controlling the presentation and admission of evidence; they may punish contemptuous conduct; and often their decisions are final and binding." 34 F.4th 446, 464 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024). The dissent took the route of the other

24

circuits, explaining that the SEC's dual-layer removal protections for its ALJs is constitutional because the "ALJs perform an adjudicative function." *Id.* at 475 (Davis, J., dissenting); *see also Leachco, Inc.*, 103 F.4th at 764 ("And while the Fifth Circuit found double-layered removal protections for ALJs unconstitutional in *Jarkesy v. Securities and Exchange Commission*, that court seemed to disregard the distinction between the PCAOB members in *Free Enterprise Fund*, who exercised executive functions, and ALJs, who perform adjudicatory functions."). The Fifth Circuit has recently applied its reasoning in *Jarkesy* to invalidate the dual-layer protections of the NLRB's ALJs. *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 774–75 (5th Cir. 2025).

The Third, Fourth and Sixth Circuits meanwhile have rejected challenges to ALJ removal protections on the basis that the alleged constitutional violation per se does not constitute cognizable harm. *See Axalta Coating Sys. LLC v. Fed. Aviation Admin.*, 144 F.4th 467, 480 (3d Cir. 2025) ("The only harm that Axalta asserts is the fact of having been made to appear before an ALJ who benefited from allegedly unconstitutional removal protections. Under [*Collins v. Yellen*, 594 U.S. 220, 258–60 (2021)] and [*NLRB v. Starbucks Corp.*, 125 F.4th 78, 88 (3d Cir. 2024)], this asserted harm cannot provide a basis for granting relief to Axalta."); *Dominion Coal Corp. v.*

25

*Dir., Off. of Workers' Comp. Programs*, No. 23-2310, — F.4th —, 2026 WL 110955, at *6 (4th Cir. Jan. 15, 2026) ("[A] litigant can't 'have the underlying agency action set aside absent reason to believe that the unconstitutional removal provision itself inflicted harm.'" (quoting *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023))); *Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 318 (6th Cir. 2022) ("[E]ven if we were to accept that the removal protections for the FDIC ALJs posed a constitutional problem, Calcutt is not entitled to relief unless he establishes that those protections 'inflict[ed] compensable harm,' and he has not made this showing." (quoting *Collins*, 594 U.S. at 259)), *rev'd on other grounds*, 598 U.S. 623 (2023). In particular, even though its holding was based on the lack of cognizable harm, the Sixth Circuit in *Calcutt* nevertheless explained that "even if [plaintiff] established that the removal protections caused him harm, *Free Enterprise Fund* explicitly excludes ALJs from its prohibition on multiple levels of for-cause removal protection," and found that FDIC ALJs "perform adjudicatory functions" subject to review by the FDIC Board, rendering their removal restrictions constitutional. 37 F.4th at 318–20.

All this to say: by my count, the Fifth Circuit stands alone in holding that dual-layer removal protections for agency ALJs are unconstitutional. Rather, the

reasoning laid out above is in accord with the majority of our sister circuits, falls within settled precedent, and is supported by both fundamental separation-of-powers principles and historical practice. Plaintiffs are unlikely to succeed on the merits of their constitutional challenge to the removal protections afforded the NLRB's ALJs.

## B. Appointment of Administrative Law Judge Chu

Plaintiffs' Appointments Clause claim presents a narrower issue: whether an ALJ who was invalidly appointed, but whose appointment was ratified before his decision was issued, renders continuation of the proceeding before the Board a per se constitutional injury.[10] To me, the answer is plain: no.

In *NLRB v. Newark Electric Co.*, we held that actions by an invalidly appointed officer could be rendered valid by subsequent ratification. 14 F.4th 152, 160–61 & n.6 (2d Cir. 2021). We looked approvingly to the D.C. Circuit's decision in *Wilkes-Barre Hospital Co. v. NRLB*, 857 F.3d 364, 370–71 (D.C. Cir. 2017), which held that a properly constituted Board could ratify the initially invalid appointment of an inferior officer, who could then ratify his own invalid acts.

---

[10] There is no need to decide whether subjection to further proceedings before Judge Chu would impose such an injury. That question is now moot, as those proceedings have concluded and Judge Chu has retired.

While Plaintiffs' claim presents a novel question in our circuit, it logically follows from these precedents that, if the constitutional defect of a decision can be cured by subsequent ratification, the constitutional defect of a proceeding can be cured as well, at least prospectively. It would make little sense if the outcome of a proceeding could be made constitutionally valid but the proceeding itself could not. Once Judge Chu's appointment was properly ratified, any here-and-now injury stemming from the invalidity of his appointment ceased.[11] After that point, Plaintiffs were no longer subject to a proceeding before an invalidly appointed ALJ.

*Lucia v. SEC*, 585 U.S. 237 (2018), is not to the contrary. There, the Supreme Court held that the proper remedy for an invalid decision rendered by an improperly appointed ALJ was a new hearing, either before a different ALJ or before the Commission itself. 585 U.S. at 251–52. The Court said nothing about here-and-now injuries or whether enjoining an agency proceeding is an appropriate or permissible remedy for a faulty appointment. Rather, *Lucia* dealt with an Appointments Clause challenge in its typical posture—on judicial review

---

[11] I would assume without deciding that such an injury would be cognizable and that Plaintiffs suffered it. Any question as to whether Judge Chu's initial appointment will have affected the validity of the agency's final decision is not yet ripe. That question must await judicial review of the decision itself, which the Board has yet to issue.

of the agency's final action. The question of whether continuing an agency proceeding after ratification of an initially faulty appointment imposes a here-and-now injury—let alone one that might justify permanently enjoining the entire proceeding—is a different one entirely.

*     *     *

Plaintiffs have failed to demonstrate a likelihood of success on the merits of their constitutional challenges. While I join in the majority's conclusion that Plaintiffs fail to demonstrate irreparable harm, I think Plaintiffs also fail to bring a constitutional challenge of any merit. I would not shy away from reaching the latter.